THE " AMERICA."

1. Where two vessels under steam, meeting end on, or nearly end on, neglect, until it is too late to avoid a collision, to comply with the rule requiring each to port her helm, it is no defence for either to prove that she ported her helm before the collision actually occurred. The act of compliance must be seasonable; otherwise it is without substantial merit.
2. In this case, as both vessels were in fault, the damages, and the costs in the courts below, should be apportioned between them.

APPEAL from the Circuit Court of the United States for the Southern District of New York.

*Mr. B. D. Silliman* for the appellants.
*Mr. W. R. Beebe, contra.*

MR. JUSTICE CLIFFORD delivered the opinion of the court.

Sailing rules were ordained to prevent collisions between ships employed in navigation, and to preserve life and property embarked in that perilous pursuit, and not to enable those whose duty it is to adopt, if possible, the necessary precautions to avoid such a disaster, to determine how little they can do

in that direction without becoming responsible for its conse-
quences, in case it occurs.

Except in special cases, the sailing ship is required to keep
her course where a steamship is approaching in such a direction
as to involve risk of collision : but the rule is widely different if
the two ships are under steam, and they are meeting end on, or
nearly end on, so as to involve risk of collision ; the requirement
in that event being that the helms of both shall be put to port,
*so that each may pass on the port side of the other.*  13 Stat. 60.

Steamships meeting end on, or nearly end on, should season-
ably adopt the required precaution ; and neither can be excused
from responsibility, in case of omission, merely upon the ground
that it was the duty of the other to have adopted the corre-
sponding precaution at the same time, if it appears that the
party setting up that excuse enjoyed equal facility to obey the
requirement with the other party, and might have prevented
the disaster.  Imperative obligation is imposed upon each to
comply with the rule of navigation ; nor will the neglect of one
excuse the other in a case where each might have prevented
the disaster, as the law requires both to adopt every necessary
precaution, if practicable, to prevent the collision, and will not
tolerate any attempt of either, in such an emergency, to appor-
tion the required precaution to avoid the impending danger, in
case where both or either might secure perfect safety to both
ships and all intrusted with their control and management.

Two steamboats, — to wit, the steam-tug " Fairfield " and the
ferry-boat " America," — on the 13th of December, 1866, col-
lided in East River, in the harbor of New York; and it appears
by the transcript that the owners of the former instituted the
present suit in the District Court of the United States against
the ferry-boat to recover damages for the injuries sustained by
the steam-tug on the occasion, whereby it is alleged that she
was damaged to such an extent, that she soon sank and became
a total loss.  Service was made; and the owners of the ferry-
boat appeared, and filed an answer.  Testimony was taken on
both sides; and the District Court, having heard the parties,
entered a decree, dismissing the libel; and the libellants ap-
pealed to the Circuit Court.  Hearing was again had in the
Circuit Court; and the Circuit Court reversed the decree of the

District Court, and entered a decretal order in favor of the libellants, and referred the cause to a master to estimate the damages. Subsequently the master made a report, to which the respondents filed exceptions; but the Circuit Court overruled the exceptions, and entered a final decree in favor of the libellants for the sum of $17,723.75, with the costs of both courts; from which decree the respondents appealed to this court.

Sufficient appears to show that the steam-tug was proceeding down East River, having come from the Navy-Yard, and that she was bound on a trip round the Battery into the North River; that the other steamer was a ferry-boat, belonging to the Fulton Ferry, and was making one of her regular trips from her slip at the foot of Fulton Street, New York, to her slip at the foot of Fulton Street, in the city of Brooklyn. Theories widely different, and irreconcilably inconsistent, are maintained by the respective parties; but it may afford some aid in reaching the true solution of the controversy to reproduce those theories before adverting to the evidence by which each of the parties attempts to show that the other is responsible for the disaster.

Both parties agree that the tide was ebb; and the libellants allege that the steam-tug, in proceeding on her intended trip, was heading down the river, nearly in the middle of the same, when the ferry-boat left her slip on the New-York side for the purpose of transporting her passengers to her slip on the Brooklyn side; that, as the two vessels advanced towards each other, she, the steam-tug, blew one whistle to indicate that she intended to go to the right, and that she ported her helm at the same time, as evidencing that intention; that the ferry-boat paid no attention to the signal given by the steam-tug, but continued her course up the river, and towards the vessel of the libellants; and that the steam-tug, finding that the ferry-boat was rapidly approaching without changing her course, and that a collision would probably ensue if she, the steam-tug, pursued her course, rang her bell to slow, stop, and back; and the libellants aver that the orders were promptly obeyed, and that the headway of their vessel was nearly or quite stopped; and they charge that it was not until their vessel was in that condition that the ferry-boat blew two whistles to indicate that it was her intention to go to the left; and they also aver to the

effect that it was then too late to avoid a collision, for two reasons, — first, because the vessels were too close together; and secondly, because the power of the steam-tug to move forward was stopped; that the steam-tug, under the circumstances, could not do any thing except to continue to back her engine; and the allegation is, that the ferry-boat kept on at full speed, striking the steam-tug on her port bow, crushing in her planks and timbers to such an extent that she sank in a few minutes.

Suppose those allegations were all founded in fact: the conclusion of the libellants, that the collision happened through the carelessness, negligence, and want of skill and proper management, in those navigating the ferry-boat, might perhaps be adopted as correct: but the whole theory of fact involved in those allegations is denied by the respondents; and they allege, that, when the pilot of the ferry-boat discovered the steam-tug, the former was not more than two hundred yards from the Brooklyn shore, and about the same distance from her slip on that side of the river; and that she was heading up the river, against a strong ebb tide, for the purpose of getting room to swing into her slip, and that the ferry-boat was under full speed, heading down the river and towards the Brooklyn shore, on a course which, if continued, would carry her in front of the steam-tug on the Brooklyn side of the river; that the ferry-boat thereupon kept steadily on her course up the river, in order that the steam-tug might pass in front of her, as she easily might have done, without any danger of collision; and the respondents allege that the steam-tug continued that course under full headway until she was within a short distance of the ferry-boat, when it was impossible for the two boats to prevent a collision; and the respondents aver that it was at that moment, and under those circumstances, that the steam-tug blew one whistle, to indicate that she intended to go to the right, and that the ferry-boat answered the signal with one whistle, and put her helm hard a-port, and reversed her engine, and backed, which was all she could do in the emergency to avoid the impending peril. Hence they aver that the collision was caused by the carelessness, negligence, and want of skill and proper management, of those in charge of the steam-tug.

Evidence giving some support to each of the conflicting

theories is exhibited in the record, and the District Court decided in favor of that assumed by the respondents; but the Circuit Court was of the opinion that the libellants ought to recover, and entered a final decree in their favor.

Mutual accusations are made, each against the other, that the respective steamers were without lookouts: but the court here does not find it necessary to give such accusations, in this case, much examination, as the proofs are clear and satisfactory that each vessel was seen by the other in ample season to have adopted every necessary precaution to have prevented the collision; and it also appears to the entire satisfaction of the court that the want of a lookout on the one side or the other did not contribute in any degree to the disaster; which is all that need be remarked in respect to those accusations. *The Farragut*, 10 Wall. 338; *The City of Washington, supra*, p. 31.

Viewed in the light of these suggestions, it is quite clear that the decision must turn upon the merits of the controversy. Inevitable accident is not set up by either party; nor could it be with any hope of success, as it appears beyond all doubt that each steamer was seasonably seen by the other, as they were approaching nearly end on, and that they collided, the ferry-boat striking the steam-tug on the port bow, just aft the stem, in the open channel of the river, where each might have passed the other on either side in perfect safety, if proper measures for that purpose had been seasonably adopted to carry such an intention into effect.

Decided support to the material facts of that proposition is found in the libel and in the answer, as well as in the statements of the principal witnesses on both sides. Nothing different could have been intended by the libellants, as they allege that the steam-tug " headed down the East River, and about the middle thereof;" and the respondents allege that the ferry-boat " was heading up the East River, against a strong ebb-tide, for the purpose of getting room to swing into her slip."

Confirmation of that view is also derived from the charts exhibited by the parties, which show that the two steamers were approaching each other nearly end on, without any substantial change of course, until they were so close together that no efforts of those in charge of their navigation could possibly have avoided the impending danger.

Argument to show that nothing could have been done at that moment to avoid the collision is quite unnecessary, as the proposition is self-evident; but the fault consists in getting the two vessels into that dangerous situation. Precautions in such cases must be seasonable in order to be effectual; and if they are not so, and a collision ensues in consequence of such delay, it is no defence to allege and prove that nothing more could be done at the moment to prevent it, nor to allege and prove that the necessity for precautionary measures was not perceived until it was too late to render them availing.

Inability to do any thing effectual to prevent a collision, at the moment it occurs, usually exists; but it seldom happens that there is much difficulty in tracing the cause which produced it to some antecedent neglect, carelessness, or unskilfulness, in those having the command of one or both of the vessels.

Two ships under steam, if they are meeting end on, or nearly end on, so as to involve risk of collision, are required to put their helms to port, so that each may pass on the port side of the other: but, if they neglect to comply with that requirement until it is so late that the object to be accomplished cannot be effected, it is no defence to allege or prove that one or both ported their helms before the collision occurred; for, unless a party seasonably complies with the requirement, the act of compliance is without substantial merit.

Both parties allege in this case that they ported their helms; and the court here is of the opinion, that, if either had put the helm hard a-port in season, the loss of property would not have taken place. Beyond all doubt, it was the duty of each to have complied with that rule; but inasmuch as the circumstances convince the court, that, if either had properly complied with the rule, the collision would have been avoided, the conclusion must be that both were in fault.

Seasonable compliance with the rule is not alleged by the respondents, nor is there any proof exhibited in the transcript to warrant such a conclusion. Instead of that, the answer admits, in effect, that the collision was inevitable before the ferry-boat put her helm to port. Nor have the respondents attempted to place their defence entirely upon that ground. Merit to some extent is claimed by the libellants because those

in charge of the steam-tug did at some time blow one whistle to indicate that the steam-tug would go to the right, and that she ported her helm; but the evidence convinces the court that the signal was not seasonable, and that the porting of the helm was by no means sufficient to constitute a compliance with the rule of navigation.

Grant that, and still the libellants suggest that the ferry-boat paid no attention to the signal; and it may be that the charge is correct; but, if so, it would not follow that the steam-tug might run down the ferry-boat, as rules of navigation are ordained to preserve life and property, and not to promote or authorize collision. Even flagrant fault committed by one of two vessels approaching each other from opposite directions will not excuse the other from adopting every proper precaution to prevent a collision. *The Maria Martin*, 12 Wall. 47.

Admit that proposition, and still the libellants suggest that they also rang to slow, stop, and back; and they aver that the signals to that effect were properly obeyed: but the court is convinced from the evidence that these last-mentioned signals immediately followed the whistle to go to the right, and that the signals, one and all, were too late to be effectual.

Indefinite as the allegations of the libel are, it may well be urged that the libel contains nothing inconsistent with that conclusion; and the answer expressly alleges, that, as soon as the steam-tug blew her whistle, it was obvious that she would strike the ferry-boat on the starboard side, unless the ferry-boat changed her course "to ease the blow."

Tested by these several considerations, the court here is of the opinion that both vessels were in fault, and that the damages and the costs in both of the courts below should be equally apportioned between the two vessels, as prescribed by the decisions of this court. *The Catharine*, 17 How. 173; *The St. Charles*, 19 id. 109; *The Maria Martin*, 12 Wall. 43; *The Morning Light*, 2 id. 557.

> *Decree reversed, with costs in this court, and the cause remanded with directions to apportion the damages and the costs in both courts below equally between the respective vessels, in conformity with the opinion of the court.*