## THE MARY C. ELPHICKE.

### (District Court, N. D. Ohio, E. D.   March 28, 1902.)

COLLISION—STEAMSHIPS MEETING—FAILURE TO CHANGE COURSE.

Under Article 17 of the rules for navigation on the Great Lakes it is the duty of each of two steamers meeting end on, or nearly end on, as soon as signals have been exchanged for passing port to port, to change her course to starboard, and a failure to do so, where there is nothing to prevent, is a fault; but the failure of one vessel to do so will not excuse the other for a failure to make a sufficient change in her own course to avoid danger of collision when it can safely be done, and she will be held equally in fault for a collision which she might thus have prevented, although she did in fact make such a change in her course as would have avoided the collision if the other vessel had done likewise.

In Admiralty. Suit for collision.

Hoyt, Dustin & Kelley, for libelant.

Goulder, Holding & Masten, for respondent.

WING, District Judge. On the 26th day of August, 1901, the steamer General Orlando M. Poe, owned by the libelant, having in tow two barges, was bound up the St. Clair river near Sarnia, and the steamship Mary C. Elphicke, owned by the Federal Steamship Company, claimant and cross libelant, loaded so that she would draw about 18 feet and 6 inches, was bound down the St. Clair river. The Poe, when at a distance from the Elphicke of about a mile, or three-quarters of a mile, signaled to her with one blast of the whistle. This signal was immediately accepted, by the sounding of a corresponding signal by the Elphicke. The charts introduced in evidence show that the St. Clair river, at about the point of collision, makes a bend to

the westward, so that a vessel making this bend is required to change, her course to the extent of about six points. This change of course is naturally accomplished, by a vessel bound down, by a swing to starboard under a ported helm. A stream called Black river flows into the St. Clair river from the westward at about the point of the bend, which has had the effect to make what is called in the testimony the "Middle Ground," the position of which is indicated to navigators by a gas buoy opposite the mouth of Black river and a black spar buoy about 1,500 feet further down stream. The width of the river between the Canadian shore and the gas buoy is about 1,600 feet, and between the Canadian shore and the black spar buoy about 1,150 feet. The width of the channel at these points for safe navigation of vessels is somewhat less than these measurements would indicate, owing to the fact that the limits of this made ground may, from time to time, change, and that the buoys may not always correctly indicate such limits. There is considerable conflict of testimony as to the distance of the course of the Poe, at or near the point of collision, from the Canadian shore. The libelant would put it between 200 and 300 feet. The respondent would put it at least 400 feet. It does not appear, from either theory, that the course of the Poe was so near to the Canadian shore that it would have been unsafe for her to change her course, temporarily at least, further to starboard. It is shown by the testimony of the libelant, and practically admitted as a fact in the cause, that the Poe did not change her wheel at the time of exchanging signals with the Elphicke, nor thereafter, until after the collision. The rules enacted for navigation on the Lakes required her to do this, and her omission to do it was a fault which helped to cause the collision.

The more difficult question in the case is with respect to the presence or absence of fault in the navigation of the Elphicke. The witness Conniff, who was first mate of the Elphicke, was on the bridge with the master, Wilson, at and before the time of the collision, after the steamer entered the St. Clair river. The ship is described as one easily handled, and ordinarily amenable to her helm. The Elphicke was about a mile, or three-quarters of a mile, from the Poe when attention was first given to her; and at the time the signals were exchanged the position of the Elphicke was about opposite Butler street in Port Huron. Counsel for the respondent made the following inquiry of the witness: "State whether at that time (the time of the exchange of signals) you were in a usual or unusual, proper or improper, place for going down." Objection was interposed and sustained, and the question was then asked, "Where were you with reference to the ordinary course going down?" Objection was also made to this interrogatory, which was sustained by the court; and record was then made of the offer, by respondent's counsel, to prove, by the answer of the witness to the question, that he was on the ordinary course. I will assume, for the purpose of the decision in this case, that the Elphicke was on the ordinary course, and that, from such course, it was necessary to change six points to make the bend in the river. The witness, being asked further what was done after that,—that is, after the interchange of signals,—answered, "We pro-

ceeded down the river on a slow swing, with a port wheel, just to merely start, and when we reached a point a little lower down the river I put the wheel to port more,—told the wheelsman to port faster." About this time it appears from the testimony that the Elphicke gave another signal of one blast. As the mate says, "I blew one blast; seeing that the fellow was not giving me what I considered was room to pass, I gave him one blast of my whistle, which he answered." At this time the boats were four or five times the Elphicke's length apart. The ordinary and natural course of the Elphicke required her to port her helm about the time that it appears she did upon this occasion. A porting of her helm sufficient only to make this course would not have been a compliance with rule 17. The Elphicke's ordinary and natural course down the river would be a curved line. The course of the ascending vessel would be a straight line, to about the point of collision, which might intersect the curved line, or become tangent to it. When vessels are approaching each other in this manner, they are held to be "meeting end on, or nearly end on." The risk involved is of the vessels coming together at either of the points mentioned, of intersection or tangential contact or coincidence. Care should be taken, under such circumstances, by each vessel, to make its path such that it will not, at any point, coincide with the path of the other. The line of the course of either vessel should be regarded as having the width, at least, of the beam of the vessel. It is a certain fact in this case, of course, that the paths of the vessels did coincide, and that the path of the Poe was in no wise changed. The path of the Elphicke coincided with that of the Poe, or lapped over it, to the extent of at least 20 feet. It appears from this that the Elphicke altered her course to an extent sufficient only to avoid collision in the event that the Poe also performed her part, but insufficient to pass if the Poe should omit to change her course to starboard; but, as said in The America, 92 U. S. 432, 23 L. Ed. 724:

"Steamships meeting end on, or nearly end on, should seasonably adopt the required precaution; and neither can be excused from responsibility, in case of omission, merely upon the ground that it was the duty of the other to have adopted the corresponding precaution at the same time, if it appears that the party setting up that excuse enjoyed equal facility to obey the requirement with the other party, and might have prevented the disaster. Imperative obligation is imposed upon each to comply with the rule of navigation; nor will the neglect of one excuse the other in a case where each might have prevented the disaster, as the law requires both to adopt every necessary precaution, if practicable, to prevent the collision, and will not tolerate any attempt of either, in such an emergency, to apportion the required precaution to avoid the impending danger, in case where both or either might secure perfect safety to both ships and all intrusted with their control and management."

It is apparent that the Elphicke either changed her course insufficiently after she began to change, or else did not begin to make the change soon enough to avoid the collision. There was nothing to prevent her so doing, and the omission was a fault. Her excuse that she did her part, which would have been sufficient had the Poe also done hers, is insufficient to exculpate.

For the purposes of this case, the interpretation of rule 17, founded upon the authorities as I read them, requires that, when a vessel

is meeting another end on, or nearly end on, so as to involve risk of collision, she must alter her course to starboard, if there is nothing to prevent, so that she will pass on the port side of the other, even though the other maintains her course unaltered; that to omit doing this is a fault; that the failure and omission of the other vessel to change her course in a similar manner is also a fault; and that both faults, under such circumstances, contribute, as causes, to the collision.

I find both vessels to have been in fault. Order may be drawn referring the question of damages suffered by both to a master. These damages will be divided, in accordance with the ordinary rule.