HALL v. CHISHOLM et al.

CHISHOLM et al. v. HALL.

(Circuit Court of Appeals, Sixth Circuit. July 8, 1902.)

Nos. 983, 1,028.

**1. ADMIRALTY—LIBEL OF REVIEW—POWER TO ENTERTAIN.**
    A court of admiralty may entertain a libel of review to correct its decree after the expiration of the term, where the petitioner is shown to be free from fraud or negligence in the matter, and the entering of the decree shows such fraud, or its equivalent, in effect, upon the rights of the petitioner, as to require the remedial action of the court upon principles of justice.

**2. SAME—SETTING ASIDE DECREE INADVERTENTLY ENTERED.**
    Where a decree dismissing a libel was inadvertently entered by the clerk, no order having been made by the judge, although he had indicated his intention to dismiss, and the fact of the entry was not known to the judge or counsel until after the close of the term and the expiration of the time for appeal, the court properly entertained a libel of review to set such decree aside, with a view of re-entering the same as of a later date, to preserve libelant's right of appeal.

**3. COLLISION—OVERTAKING STEAMER AND RAFT—NEGLIGENT NAVIGATION.**
    A raft of logs 2,000 feet long was being towed down the St. Clair river by three tugs, one of which was in front, to guide the forward end. An overtaking steamer was attempting to pass on the American side, when the head of the raft, reaching a bend in the river, came close to the shore, and the steamer, striking the land, sheered, and ran into it with such force as to break the boom sticks, and scatter the logs. *Held*, that

¶ 1. See Admiralty, vol. 1, Cent. Dig. §§ 677, 681.

the steamer was in fault for not being under better control, which was required in view of the manifest danger of collision; that the navigators of the raft were also in fault, it appearing that the forward tug was not making proper effort to keep the head of the raft off from the shore.

Appeals from the District Court of the United States for the Eastern District of Michigan.

T. E. Tarsney, for Hall.

Harvey D. Goulder, for the J. H. Wade.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

DAY, Circuit Judge. These cases were heard together, and originated in a cause in admiralty in the district court of the United States for the Eastern district of Michigan. In No. 1,028 an appeal was taken by Chisholm and others, in whose favor the court had decided upon the merits of the case. The libel was filed in the first case (No. 983) by E. Hall against the owners of the steamer J. H. Wade, and was dismissed upon final hearing. The case was heard in March, 1899. The district judge stated his intention to dismiss the libel, but did not make or sign any order or decree. The clerk of the court, however, supposing the order to have been finally made, entered the same upon the journal of that day. Counsel for the libelant gave notice at the time of their intention to appeal, and, the testimony being voluminous, negotiations were entered into between counsel for the purpose of reducing the expense of printing the record, and stipulations were agreed upon as to printing the testimony in the case. Pending these negotiations, the time for appeal had expired, and it was then disclosed for the first time that the clerk had entered the decree as of March 4th. Thereupon the libelant filed a petition for leave to file a bill of review containing the statements outlined above, the sixth paragraph thereof being as follows:

"Your petitioner further represents that he was absolutely without knowledge of the entering of said order dismissing said libel, as were his proctors, as he is informed and believes, and as appears from the affidavit of Timothy E. Tarsney, hereto attached, as aforesaid; and that he was not, or were his proctors, as he was informed and believes, apprised or notified by any direction of the said court to the clerk thereof to enter or cause to be entered the alleged order or decree dismissing the libel; and that the said alleged order or decree was entered without notice to, or knowledge of, the proctors for the respondents therein, as appears from the copies of correspondence attached to the affidavit of the said Tarsney, as aforesaid; that the journal of said court for the said day of March 4, A. D. 1899, was not signed by the judge thereof, as your petitioner is informed and believes, contrary to the usual custom; and your petitioner is informed and believes that said order or decree was entered upon the journal of said court by the clerk thereof inadvertently, while the said clerk was laboring under a misapprehension, to wit, that the court had pronounced a final decree in said cause, when, as a matter of fact, no such final pronouncement was made, but, as your petitioner is informed and believes, it was orally announced by said court that he, said court, would dismiss said libel, implying an intention to dismiss it at some future time, not giving expression to a judicial act to take immediate effect as of said date, with a direction to said clerk to enter the same upon the journal of said court."

These allegations were not denied in the answer. The questions presented by this appeal are whether the court of admiralty may set aside its decree after the expiration of the term at which it was entered, and whether the facts in the present case are sufficient to warrant the granting of the relief prayed for. There seems to have been some difference of opinion among the judges and text-writers upon this subject, but an examination of the authorities leads us to the conclusion that, in the absence of other remedies, a bill of review may be filed in a court of admiralty after the term, for the purpose of setting aside a decree entered through fraud or inadvertence without the fault of the party making the application. If this were not so, parties against whom a decree had been rendered in an admiralty suit by fraud or mistake would be without remedy. The cases upon this subject are reviewed in an able opinion by District Judge Lowell in the case of Snow v. Edwards, 2 Low. 273, Fed. Cas. No. 13,145. The learned judge states in the course of his opinion that, notwithstanding some dicta to the contrary, it has been the constant practice of courts of admiralty in England and the United States of original jurisdiction, to correct or change a decree upon a libel of review, except that in the United States summary proceedings by motion have been held to be ineffectual after the expiration of the term. This case has been followed by other and later cases, the latest of which is The Columbia (D. C.) 100 Fed. 890, where the cases are fully collated and cited. Judge Story in the case of The New England, 3 Sumn. 495, Fed. Cas. No. 10,151, states the rule to be as follows:

"But upon the most careful reflection I have been able to bestow upon it, the result to which I have brought my mind is that, if the district court has a right to entertain a libel of review in any case, it must be limited to very special cases, and either where no appeal by law lies, because the matter is less in value than is required by law to justify an appeal, or the proper time for appeal is passed, and the decree remains unexecuted, or where there is clear error in matter at law, or, if not, where the decree has been obtained by fraud, or where new facts, changing the entire merits, have been discovered since the decree was passed."

Betts' Adm., quoted by Judge Thomas in the case of The Columbia, supra, states the rule as follows:

"The power, however, will only be exercised by the court when no relief by appeal can be had; and the declaration of the court of last resort upon the subject imports that in this country courts of admiralty cannot, in any case, sustain such bill filed subsequent to the term in which the decision is rendered."

In the case of The New England, supra, Judge Story quotes with approval the language of Lord Stowell to the effect that mere negligence or oversight would not be sufficient, but a direct case of fraud, or something equivalent to it, must be made out. This view was reached by Mr. Justice Davis while upon the circuit. Car Co. v. Hopkins, 4 Biss. 51, Fed. Cas. No. 10,334. In the circuit court of appeals, Ninth circuit, Munks v. Jackson, 13 C. C. A. 641, 66 Fed. 571, relief was granted by bill of review. Although the case did not show actual fraud, yet the facts were held to warrant the relief sought by bill of review, within the sound discretion of the court, and under

such rules of decision as the sound principles of justice and policy might dictate.

We think the reasoning of these authorities establishes that a court of admiralty may entertain a libel of review to correct its decree after the expiration of the term, where the petitioner is shown to be free from fraud or negligence in the matter, and the entering of the decree shows such fraud, or its equivalent, in effect, upon the rights of the petitioner, as to require the remedial action of the court upon principles of justice. In the present case the law gives to the libelant the right to have his case reviewed by appellate proceedings, seasonably taken after the entering of the decree. It was not understood by the judge who heard the case, or by the counsel, that any final decision had been reached or that any entry would be made on March 4th. Counsel were not aware for some time that the clerk inadvertently entered the decree upon the journal. Upon discovering this fact, the libel in review was promptly filed. While there is no claim of actual fraud in this matter, to permit it to conclude the privilege of the party to appeal would have the same effect upon his rights as would the entry of a decree from improper motives. The record was voluminous, and the parties were proceeding to settle it with a view to reducing the cost of printing, when, unknown to them, the entry was made by the clerk. No laches could be charged to the libelant. Under such circumstances, we think the court, exercising a sound discretion, and in the interests of justice, many entertain a libel in review after the term, with a view to setting aside the decree inadvertently entered, and re-enter the same in the manner and at the time directed by the court.

We find no error in the action of the district court in this regard.

Case No. 983 presents the case upon its merits. The libel was filed by the owner of a certain raft of logs for damages alleged to have been sustained by the improper handling of the steamer J. H. Wade, resulting in a collision with the raft, and thereby damaging the same, and causing the loss of a large number of logs. The collision occurred about 6 o'clock in the morning of June 18, 1895, at a point in the St. Clair river where the river makes a sharp bend. The raft was a large one, being at the widest point perhaps 250 feet wide, and being some 2,000 feet long. The raft was in charge of three tugs; the Protector, the largest tug, was ahead, to tow and guide the raft, having out some 200 feet of line. The Parker, a smaller tug, was astern, to swing that end of the raft, being headed up stream, the tow being headed down stream. The Boynton, a third tug, at the time of the collision was on the American side of the river, with her bow against the raft, pushing toward the Canadian shore. The Wade, bound down, sighted the raft, and there was an interchange of signals, about which there is a conflict in the testimony. There is no dispute, however, that when the Wade attempted to pass the raft on the American shore there was ample space to justify her in coming down abreast of the raft, and the witnesses for the libelant do not seem to complain so much of the Wade for coming down, as for her failure to check her speed sufficiently to have the vessel under control before she ran into the raft. The testimony shows that when the

Wade reached the forward end of the raft she took a sudden sheer or list to port, and ran into the raft with considerable force, breaking the guy line, and scattering the logs. There is a decided conflict in the testimony as to the speed with which the Wade was running when she came down to the point of collision with the raft. The officers and crew in charge of the Wade and those having the raft in charge are in irreconcilable conflict, the former testifying that the Wade was checked more than once, until she was running very slowly; that before the collision she was losing steerageway, and more speed was put on; and that she then dropped back to a very slow rate of speed, and was so running when, by striking the land on the American side, she was caused to take a sudden sheer into the raft. Aside from the testimony of the officers and crew, counsel for the Wade produce the testimony of several persons residing in summer homes on the American side of the St. Clair river, who observed the collision; also, of the officers of a tug which came alongside the Protector, with a view to obtaining employment, shortly before the collision took place. We think it is apparent from the testimony that it cannot be concluded that the Wade did not check her speed. On the contrary, we think the testimony establishes the fact that the Wade did check up considerably while she was running alongside the raft, and near the American shore. It was a situation, however, where it is apparent it was easier to manage and control the steamer than the long and unwieldy raft which was in tow of the tugs. We think it was the duty of the master of the Wade to use her superior facilities in such a manner as care and good seamanship required to prevent injury to the raft. It is undoubtedly lawful to tow logs of rafts on the Great Lakes and connecting rivers, and while the master of the raft must exercise that degree of care that is required by the rules of navigation, this duty is also incumbent upon other navigators. The Athabasca (D. C.) 45 Fed. 651. Nor can we doubt that the Wade was well over on the American side. This fact is established by the testimony of disinterested witnesses. The raft, coming around the bend, owing to its great length, would naturally have its bow end nearest the American shore. The testimony develops that the Wade came down near to the bow end, and observers, not interested in the case, say that there was too narrow a space for her to get through, and that the Wade was so near to the American shore that she was stirring up the soil to a considerable extent. The raft was in plain view of the Wade for a considerable distance. Under such circumstances, it must have been apparent to the master of the Wade that a collision was imminent, and it devolved upon him to get his vessel under control, so that she might be checked,—even stopped,—if necessary to prevent the collision. When testimony is in such direct conflict, reference must be had to such physical facts as are disclosed by the proof. We regard it as established that when the Wade took the sheer into the raft, before she could be stopped she had run into the raft so far as to engage the logs in her wheel. This is the testimony of her engineer. Upon the theory of the appellee's case, the Wade was being crowded too close to the American shore,— closer than it was safe for her to go,—and it was claimed that the

forward tug was making no effort to get the raft out of the way. While the testimony shows that the Wade was somewhat checked, she must have been still running with considerable speed when she struck the raft, to break the boom sticks, and to run her length of 283 feet into the logs, so that almost immediately after the collision they were bumping her wheel. Under these circumstances, we do not think the Wade was under that control or handled with the care she should have been to avert the collision. The situation at the time was apparent to the master, and we cannot exonerate him from fault in causing the collision.

On the other hand, we are not satisfied that the navigators of the raft were free from negligence in the management of the tow. The taking of such rafts through such places as this bend in the St. Clair river requires a good deal of skill and management. In turning the bend, the raft appeared to the witness on the shore to make a wedge-like appearance from his point of view. Undoubtedly the end of the raft was very near to the American shore, and the testimony discloses that the Wade, coming down and attempting to pass, made it the duty of the master of the Protector to do all that could be done to get the head of the raft away from the American shore, so as to permit the passage of the Wade. Maines, engineer on the Kitty Haight, which had come alongside the Protector, for the purpose of obtaining employment, to assist in the handling of the tow, testified that he asked the pilot of the Protector "to go ahead, and let the Wade out," and he answered that he "guessed it was all right; he would go slow, and let the raft drift around with the current." Another witness (the master of the Kitty Haight) testified that the Protector was right ahead of the raft, and not making any particular effort to get the head of the raft around. From this view of the situation, and from other facts shown in the record, we cannot exonerate the managers of the raft from blame in failing to swing the head of the raft out of the way of the Wade, or at least in attempting so to do. We regard this negligence as directly contributing to the injury. We reach the conclusion that the collision was the result of the negligence of both parties in the manner pointed out, and that the damages should be equally divided between them.

The district judge dismissed the libel without filing an opinion, from which we are left to infer that he regarded the managers of the raft solely to blame for the collision. Reaching the conclusion that both parties were at fault, the decree below will be modified, and the damages and costs equally divided between the parties.

### On Petition for Rehearing.
(October 7, 1902.)

We have carefully examined the grounds alleged for a rehearing in the petition and brief filed by the learned counsel for the appellees. The petition is based largely upon the proposition that the court found with the appellees as to the allegations of the libel concerning the steamer Wade's rate of speed at and before the collision. We reached the conclusion upon the hearing that, while the Wade was not running at a high and unchecked rate of speed to the extent averred

in the libel, still she was, just before the collision, running at a higher rate of speed than the situation warranted. There is in the record, as indicated in the original opinion, a direct conflict of testimony as to the rate of speed at which the Wade was running just prior to the collision. A number of witnesses on the tugs conducting the raft testified that she ran at a high and unchecked rate of speed. On the other hand, the crew of the Wade and some disinterested witnesses on the shore testified that she was running at a reduced rate of speed. While we are of the opinion that the speed of the Wade was checked to some extent, yet, in view of the fact that the testimony is undisputed that after the sheer she crashed into the raft with such force as to run her length into the same almost instantly, we must conclude there was still a very considerable rate of speed maintained by the Wade. In our opinion, the testimony is ample to warrant the inference that, had the Wade been under such control as was claimed by her officers and crew, she would not have struck the raft with such force and violence with the resulting injury which followed. Let it be conceded that the Wade was justified in assuming that the raft would be out of the way and coming down with a view of passing on the American side, and that the managers of the raft were in fault in not using sufficient efforts to get the head of the raft out of the way, it was, nevertheless, apparent for a considerable time before the Wade took the sheer that there was danger of a collision. In such situation, notwithstanding the fault of the navigators of the tugs towing the raft, when the collision became imminent it was the duty of the master of the Wade to use every reasonable means and precaution to avoid the collision, which, in our opinion, might have been avoided had the Wade been running slowly, and under such control as she should have been in view of the situation. There is no testimony in the case tending to show that the Wade could not have slackened, or even stopped, to avoid the collision. No matter how flagrant the fault of the navigators of the raft may have been, that would not excuse the Wade from adopting every proper precaution to avoid a collision after it became apparent that it was likely to occur. This rule is reasonable in itself, and is amply supported by the authorities. The Maria Martin, 12 Wall. 47, 20 L. Ed. 251; The America, 92 U. S. 432, 23 L. Ed. 724; Spencer, Marine Collisions, §§ 80, 81, and cases cited. In the Albert Dumois, 177 U. S. 240, 253, 20 Sup. Ct. 595, 600, 44 L. Ed. 751, Justice Brown said:

"This court has repeatedly held the fault, and even the gross fault, of one vessel does not absolve the other from the use of such precautions as good judgment and accomplished seamanship require."

It is strenuously urged that when she took the sheer the Wade was in extremis; and, it being the fault of the tugs towing the raft that placed her in that situation, no fault can be imputed to her master for not acting differently than he did at the time. Counsel say: "The Wade, unable to withdraw, was proceeding at the lowest speed either permissible or possible. Her master, who died before the trial, was in extremis by every definition and intendment of that doctrine,"—citing authorities. The rule is well settled that a master act-

ing in extremis, placed in such situation by the fault of the other, is not responsible for error of judgment in handling his vessel under such circumstances. But the fallacy of attempting to apply the doctrine here lies in assuming that the Wade was running at the lowest speed possible. If such were the fact, the sheer would have been slight, and without serious damage to the raft. The undue speed of the Wade in a situation which demanded the slowest rate practicable contributed to the injury, as well as the wrongful act of the raft's managers in crowding the Wade over to the American shore.

It is also argued that the case was decided upon issues not made in the pleadings in the court below. We cannot assent to this view. The libel was ample to warrant the finding that the Wade was running at too high rate of speed at and before the time of the collision. Pending the trial, a motion was made to amend the libel so as to aver that the Wade should have stopped before the collision. It is true, the appellees objected to this amendment. Nevertheless it was granted, as it was within the discretionary power of the trial judge to do. But we do not put the case on the absolute necessity of stopping the Wade. What we hold is that, when it became apparent that the danger of collision was imminent, even though the situation was brought about by the negligence of the navigators of the raft, it became the duty of those in charge of the Wade to abate her speed to such a degree as would prevent the danger of collision, instead of going ahead at such a rate of speed as to send the Wade at the time of the sheer against the raft with a good deal of force. We cannot avoid the conclusion reached at the hearing that, notwithstanding the negligence of the tugs, the Wade, by the exercise of due diligence, might have avoided this injury after the risk of collision became apparent.

Finding both parties at fault, we think the decree dividing the damages equally between the two vessels was just, and the rehearing will be denied.