# THE RADIUM.

## THE STROUDSBURG.

District Court, S. D. New York.
June 7, 1934.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and Eugene Underwood, both of New York City, of counsel), for libelant and the Radium.

John E. Morrissey, of New York City, for claimant.

GODDARD, District Judge.

This suit by the Gulf Refining Company, owner of the motor vessel Radium, against the steamtug Stroudsburg and her owner, the Delaware, Lackawanna & Western Railroad Company, is to recover the damage sustained by the Radium as a result of a collision between her and carfloat No. 2 in tow of the Stroudsburg which occurred about 9:50 p. m. on March 29, 1930, in the East River off Corlears Hook. The Radium, a small tanker of 339 gross tons and 153 feet over-all, propelled by a Diesel motor, was bound from Devon, Conn., to Bayonne, N. J., without cargo. The Stroudsburg was bound from Hoboken, N. J., to Long Island City, with a carfloat in tow on her port side. The Stroudsburg is 95 feet long; the carfloat 270 feet long. The night was clear; the tide was ebb. Highwater at Governors Island was at 7:53 p. m. Tidal current chart issued by United States Department of Commerce indicates that the tidal current abreast of Corlears Hook flows ebb at the rate of 1.2 knots two hours after high water. The collision occurred at a distance variously estimated to be from 500 to 1,000 feet off Corlears Hook; the stem of the Radium coming in contact with the carfloat about 50 feet from its port stern corner.

The testimony of the Radium's witnesses is that she had proceeded down about in mid-river until she passed under the Williamsburg Bridge when she directed her course slightly to starboard passing on her port hand a wreck spar buoy located 350 yards below the bridge and 225 yards off Grand street, Manhattan; after passing this buoy she headed for the power house just below the Navy Yard on the Brooklyn shore. At this time the red and green lights of the Stroudsburg were observed coming around Corlears Hook and were abreast of and about 200 feet off a derrick which was anchored 190 feet from the end of Jackson street, Manhattan. The master of the Radium further testified that upon sighting the Stroudsburg he sounded a two-blast signal and changed her course one-half point to port; that the Stroudsburg sounded a one-blast signal in reply; whereupon the Radium immediately reversed her engines full speed astern and sounded a three-blast signal to indicate that she was backing, the Stroudsburg changing her course rapidly to starboard, angling out toward the Brooklyn shore and across the Radium's course; shortly thereafter they came together almost at right angles.

The testimony of the Stroudsburg's witnesses is that she was proceeding up the middle of the river, and when off Jackson street the green light of the Radium was observed off the Stroudsburg's port bow; that the Radium was in midstream just below Williamsburg Bridge heading for the power

plant on the Brooklyn shore; that the Stroudsburg at this time was heading for the Broadway Ferry on the Brooklyn shore and showing the Radium her red side light only. The Stroudsburg sounded a one-blast signal to the Radium and held her course and speed, and receiving no reply to her one-blast signal she repeated it, and then not receiving any signal she blew an alarm signal, and as the Radium continued to come ahead, the Stroudsburg, to avoid a collision, put her helm hard to starboard to throw the stern of her tow away from the Radium but, however, the stem of the Radium struck the carfloat about 50 feet from the port stern corner.

The Radium contends that the Stroudsburg was solely at fault for the collision which, it charges, was due to the Stroudsburg's navigating near the Manhattan shore in violation of the East River statute; also that the Radium and the Stroudsburg were on parallel curving courses to the starboard of each other, the Radium proceeding down about mid-river and the Stroudsburg going up the river near the Manhattan shore, and that the Stroudsburg was at fault for failing to navigate so as to pass the Radium starboard to starboard. The Stroudsburg charges that the Radium and the Stroudsburg were on crossing courses with a starboard hand situation, and the Radium as the burdened vessel should have navigated so as to pass astern of the Stroudsburg.

The testimony is conflicting and confusing, particularly with respect to the location of the Stroudsburg when the vessels sighted each other. Witnesses for the Stroudsburg claim that she was in the middle of the river at the time, and other witnesses that she was some 200 feet to the starboard of the derrick which was anchored 190 feet off the Manhattan shore, or a total of 390 feet from the Manhattan shore. In view of this conflict, the best means, it seems to me, of determining the approximate location of the Stroudsburg at that time, is to follow her movements backward from the place where the collision occurred. The weight of the testimony establishes this as being five to six hundred feet off Corlears Hook, although the master of the Stroudsburg and other witnesses called in her behalf placed it nearer mid-river. Her master finally admitted on cross-examination that there is where it occurred. Since those in charge of the navigation of the Stroudsburg stated that when the Radium was sighted the Stroudsburg's course was changed to the starboard so as to head more for the Brooklyn shore, it is plain that she must have been nearer the Manhattan shore when she first sighted the Radium than when the collision occurred, and I think this demonstrates that the statement of the Radium's witnesses that when they first came into view the Stroudsburg was 200 feet to the starboard of the derrick is correct. Moreover, this confirms my impression of the correctness of their testimony on this point.

When they first observed each other they were a distance apart variously estimated to be between 1,500 and 2,500 feet. Whether the Stroudsburg was heading up the river as the Radium witnesses say, or more toward the Brooklyn shore, the Stroudsburg was violating the East River statute (Laws 1882, c. 410, § 757), which requires that vessels passing up and down the East River shall proceed as near as possible in the center of the river except when going in or out of berth or landing place. She was navigating within 390 feet of the Manhattan shore at a point where the river is 1,425 feet wide, and undoubtedly was attempting to avoid the full strength of ebb tide by proceeding up in the lee of Corlears Hook. The Black Diamond, 273 F. 811 (C. C. A. 2); The Transfer No. 6, 45 F.(2d) 571 (C. C. A. 2); The Corsair, 37 F.(2d) 45 (C. C. A. 2).

While it is undoubtedly true that when they first saw each other the temporary heading of the Radium was more to the southwest than it would be when she necessarily changed it to round Corlears Hook. Her apparent course was down the river, although in rounding the bend in Corlears Hook the heading of the Radium was temporarily changed. The Radium was bound down the river and the Stroudsburg was upward bound. If the navigators of either vessel had any doubt as to the course of the other there was even greater reason for a prompt exchange of signals and agreements before proceeding ahead on a new course. They were actually on meeting courses, and their positions correspond to those of the No. 16 bound down the river and the No. 6 upward bound in the case of The Transfer No. 6, supra, in which the court said, at page 573 of 45 F.(2d):

"They (advocates for No. 6) say in the first place that it was a starboard hand situation and that No. 6 was the privileged vessel. It is true that, because of the bend in the river below Corlears Hook, No. 16 was at first headed toward the Brooklyn shore and No. 6 was on her starboard hand when

the vessels sighted one another, but it is well settled that the course of a vessel is her apparent course and not her heading at any given moment. * * *

"The vessels were in fact on meeting courses, and this was well understood by the master of No. 6, as is shown not only by his testimony, but by his acquiescence in a starboard to starboard signal. * * * The apparent course was not across the river."

The master of the Radium said that upon sighting the Stroudsburg the Radium sounded a two-blast signal and changed her course one-half point to the port (toward the Brooklyn shore); then a one-blast signal was blown by the Stroudsburg, and soon afterwards the Radium reversed her engines and blew an alarm. Opposed to this is the testimony of the witnesses for the Stroudsburg who say that the first signal was a one-blast from her, and upon receiving no reply she sounded another one, and getting no answer to that she sounded an alarm and endeavored to avoid a collision by putting her helm hard to starboard to throw her stern away from the Radium. They also testified that the Radium continued on until just before the collision when she reversed. Their testimony that the Radium continued on is confirmed by the fact that the Radium covered some 1,500 feet from the place the Radium's master says the signals were exchanged to the point of collision.

After a critical observation of the witnesses and an examination of their testimony, I am unable to say with any reasonable degree of certainty just what signals were sounded and when, but I am convinced that notwithstanding there was no mutual exchange of signals or agreement between them, both the Radium and the Stroudsburg changed their courses more toward the Brooklyn shore and as both continued to go ahead the natural result followed; a collision. Each was at fault and it was serious, for the Stroudsburg made no effort to stop until the collision occurred and the Radium continued on 1,500 feet either because she did not make a timely effort to stop, or because she was not under reasonable control. The collision is a good illustration of the danger of violating the rule referred to in The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126, and A. H. Bull S. S. Co. v. United States, 34 F.(2d) 614 (C. C. A. 2), that where a vessel is approaching another vessel which has disregarded her signals or whose position or movements are uncertain, she is bound to stop until her course be ascertained for a certainty.

While the Stroudsburg had come up the Manhattan side of the river in violation of the statute, I think the violations referred to above, in which both vessels participated, were the direct causes of the collision, and that it is a case where the damages should be divided. Accordingly the libelant may have a decree for one-half damages, with the usual reference to a commissioner to fix the amount.