# KIECKHEFER CONTAINER CO. v. THE MINERVA et al.

## THE GRETCHEN.

## THE DAUNTLESS NO. 12.

No. 17 of 1943.

District Court, E. D. Pennsylvania.

Feb. 3, 1945.

Krusen, Evans & Shaw, of Philadelphia, Pa., for Kieckhefer Container Co.

Howard M. Long, of Philadelphia, Pa., for Tug Minerva and others.

Pyne & Lynch, of New York City, and Shields, Clark, Brown & McCown, of Philadelphia, Pa., for Tug Dauntless and others.

KALODNER, District Judge.

This libel is by the Kieckhefer Container Company, corporate owner of the Gretchen against the tug Minerva and against Robert W. Burritt, Elizabeth Boyer, executrix of the estate of Louis F. Boyer, deceased, and Louis Boyer, Jr., copartners trading as the Tug Minerva Company for damages for the Gretchen sustained by reason of a collision between that vessel, in tow of the tug Dauntless No. 12, and the barge Interstate No. 8, in tow of the Minerva. The owners of the Minerva have impleaded the tug Dauntless No. 12 and its owners, Chris Nielson, Charles M. Miller, Harry W. Miller, Helen Nelson, Grace Taraldsen and Hjordis Johnson, copartners trading as the Dauntless Towing Line. The Interstate No. 8 was not damaged and is not a party to the proceedings.

The court must determine at this time the question of negligence and the party or parties responsible therefor.

On the basis of the pleadings and additional testimony I make the following findings of fact:

1. The Gretchen, a scow 255 feet long, 40 feet wide and 12 feet deep, without motive power and without steering gear, is owned by the Kieckhefer Container Company.

2. The Minerva, a tug, is owned by Robert W. Burritt, Elizabeth Boyer, executrix of the estate of Louis F. Boyer, deceased, and Louis Boyer, Jr., copartners, trading as Tug Minerva Company.

3. The tug Dauntless No. 12 is owned by Chris Nielson, Charles M. Miller, Harry W. Miller, Helen Nelson, Grace Taraldsen and Hjoris Johnson, copartners, trading as Dauntless Towing Line.

4. The collision occurred on the Chesapeake Bay in the Shad Battery Channel between buoys 3, 4, 5 and 6 in the vicinity of Shad Battery Shoal on the night of September 19, 1942, a clear night with a light wind, at about 10:10 p. m.

5. The Gretchen was proceeding northeast to Delair, New Jersey, in tow of the Dauntless No. 12 which was secured to the after part of the port side of the Gretchen with about 20 feet of the Dauntless No. 12 extending aft from the stern of the Gretchen.

6. The Minerva was proceeding southwest to Baltimore, Maryland, having in tow the Interstate No. 8, an oil barge approximately 190 feet in length, 40 feet in width and 12.9 feet in depth. The Minerva was secured to the after part of the starboard side of the Interstate No. 8.

7. Each tug was in full charge and control of its respective tow.

8. The Minerva was first sighted by the Dauntless No. 12 about 3½ to 4 miles away, and the Dauntless No. 12 was sighted by the Minerva at least one-half mile away.

9. No passing signals were blown by either tug until the vessels were between 500 and 1000 feet apart, when the Minerva blew a two blast signal indicating a starboard-to-starboard pass, which the Dauntless No. 12 answered with a three blast signal indicating full speed astern. The port bows of the Interstate No. 8 and the Gretchen came into contact.

## Discussion

The instant case contains a feature common to many collision cases, that is, the testimony of each side is directly in conflict with that adduced by the other, and the determination of the true facts is difficult. A brief outline of the testimony given by the captain of each vessel involved will be sufficient for this discussion, since the testimony (by deposition)

of the men in the crews substantially supports their captains. It may be said at the outset that both captains are mariners of long experience and were familiar with the waters in which they were navigating at the time of the collision. The accident occurred on September 19, 1942, between 10:10 and 10:30 p. m. The night was clear and visibility good.

As to the ships involved, the Dauntless No. 12, built in 1938, is a steel tug, 81.5 x 24.2 x 9.8, having 600 h.p. engines. Her tow, the Gretchen, a steel scow without motive power or steering gear, measures 255 x 40 x 12, is square bowed and flat bottomed. The Minerva, an iron tug built in 1886, measures 57 x 15 x 6. While she originally had 150 h.p. engines, it appears that she had been overhauled, and the h.p. increased to 200 or 220. Her tow, the steel tanker, Interstate No. 8, measures 190 x 40 x 12.9. It has a cut bow sloped behind and square ends. The Dauntless No. 12 was made fast on the port stern quarter of the Gretchen, which was loaded to a draft of about 10 feet forward with a freeboard of two feet at the bow. The Minerva was made fast on the starboard stern quarter of the Interstate No. 8 which was loaded to a depth of about 12 feet or 12 feet six inches.

As to the scene of the accident, Shad Battery Shoal Channel is 200 yards wide between the buoys marking the sides of the channel (odd numbered buoys marking the west edge and even numbered red buoys the east edge). The upper end of Shad Battery is about 7½ miles off Turkey Point light, and the channel itself from Flashing White Light Buoy No. 5, marking the upper end of the channel (toward Turkey Point), to Flashing White Light Buoy No. 1, marking the lower end of the channel, is 2¼ miles.

Louis Gray, captain of the Minerva and her pilot at the time of the accident, stated that he was, on September 19, 1942, bound out of the Chesapeake and Delaware Canal for Baltimore, having picked up his tow at St. George's Bridge just east of Chesapeake City. His course was approximately southwest, and, having the last of the ebb tide with him, he was making about 2½ miles per hour. When the Minerva approached Flashing White Light Buoy No. 5 at the entrance to Shad Battery Channel, being about 1000 feet north or east of that buoy, Gray made out the lights of another tow not quite two points off his starboard

bow, at the lower end of the channel to the west of Can Buoy No. 3. The tow was outside the channel and according to Captain Gray, the tug threw its searchlight on Buoy No. 3 as she passed it proceeding on an easterly course. The Minerva entered the channel passing Buoy No. 5 about 100 feet on her starboard.

The picture thus presented shows the Minerva inside the channel on the right side of the "road" while the Dauntless No. 12 was outside the west edge of the channel, that is, not only was the Dauntless on the wrong side of the road, but beyond the road. Had the two vessels continued in that way, Captain Gray testified, they would have passed starboard to starboard. However, within several minutes after passing Can Buoy No. 3, the Dauntless, Gray stated, turned and showed her red port light, then turned again and showed her green starboard light. Gray then blew a two blast signal so that the captain of the Dauntless would "hold his course". At the time the signal was given, the flotillas were within 1000 feet of each other. The Dauntless did not reply and when they were about 300 feet apart, the Dauntless took a sudden sheer to her own starboard heading across the Minerva's bow. Captain Gray blew the danger signal and ordered full speed astern. Headway was reduced but before backward motion developed the port bow of the tow of the Dauntless, the Gretchen, came into contact with the tow of the Minerva, the Interstate No. 8, striking about 16 feet on the port side of the Interstate's bow and sliding off three feet from the port corner. The collision occurred about 100 feet inside the west edge of the channel between Buoys 3 and 5, about a mile from Buoy No. 5.

Following the contact, the Dauntless and its tow stood to the port of the Minerva; both flotillas stopped and exchanged names. Gray asked the captain of the Dauntless why he had not answered the two blast signal, and was told it was too close to answer; after ascertaining no damage, the vessels proceeded. The time of the accident was about 10:30 p. m.

Captain Gray suggested that a reason for the Dauntless being outside the channel on the west was the fact that there is a turn in the channel and heading from Buoy No. 1 to Buoy No. 5 gives clearance of Buoy No. 3 which might otherwise be fouled. If a captain were aware of

the turn in the channel, it would not be necessary for him to go outside to avoid Buoy No. 3.

Lloyd Cox, captain and pilot of the Dauntless No. 12, testified that he was bound for Delair, New Jersey, having in tow on his starboard side the Gretchen. Coming up from Tolchester passing Pooles Island, he entered Shad Battery Shoal Channel close to the right side (east edge) of the channel, navigating a course NE by E½E, and proceeding at the rate of about four miles per hour over the ground. When he was between Buoys No. 1 and 2 or 4, or 1 and 3, he made out the lights of another tow about 3½ to 4 miles distant, somewhere abreast of Howell's Point and to the north of the channel heading toward it. He picked up Red Nun Buoy No. 4, marking the east edge of the channel, with his searchlight and passed it close on his starboard side. The other tow was to his port, but Captain Cox saw, alternately, the red light and the green light of the Minerva, the red predominating. The Minerva passed to the northward and westward of Flashing Light Buoy No. 5. He thought the Minerva would pass port to port and blew no signals until the Minerva took a sudden sheer to her port, heading south-southwest cutting across in front of the Dauntless flotilla about 400 feet away at the same time blowing two blasts. Realizing that he could not go around the stern of the Minerva and that there would be a collision, he immediately blew a three blast signal and ordered full speed astern. Although this reduced headway, there was no backward motion and the port bow of the Interstate No. 8 struck the port bow of the Gretchen sliding under the Gretchen and listing her about three to four feet. The contact was not severe. The collision occurred on the east side of the Channel near Buoy No. 6 at 10:10 p. m. On backing off, Captain Cox asserted, he put his light on Red Nun Buoy No. 6, which marked the east edge of the channel, and found it off the stern to the left, the Interstate No. 8 having shoved his flotilla southward. The captains exchanged names and Captain Cox asked whether Captain Gray lost control, but the latter said that Captain Cox had crossed his bow. Captain Cox then asked, apparently rhetorically, whether Captain Gray knew where he was. There was a discussion about damages, and after five

to ten minutes he proceeded to his destination. The Gretchen, however, sprung a leak and began to take in water, but with the aid of pumps she was kept afloat and was docked at Delair.

Captain Cox further testified that the Minerva was about three fourths to one point off the port bow of the Dauntless and that she changed her heading about four points when she sheered across his bow. However, had she kept on her course, they would have passed port to port with from 75 to 100 feet between them.

It may be added that Captain Gray was steering a southwest course from Turkey Point as straight as possible to Shad Battery Shoal Channel, thus cutting the elbow of the channel and saving about a mile and a half. It is contended that this action coincides with Captain Cox's testimony that the Minerva entered the channel northward and westward of Flashing White Light Buoy No. 5. Captain Cox stated that he thought the Minerva would enter the channel diagonally and then turn down.

Considering all the testimony, I have come to the conclusion that the collision was brought about by the mutual fault of the Minerva and the Dauntless.

Since the Dauntless was steering a course NE by E½E and the Minerva a southwest course, there could be understandable error by the captains in estimating from a distance whether the situation was that of nearly "head and head" or crossing. See Knight's Modern Seamanship (10th Ed.1941) pp. 405, 472. Moreover, the converging courses of the two flotillas may well account for the disagreement between the captains on the manner of passing. The situation has been described thus: " * * * a vessel sees, a little on her starboard bow, the green light of another vessel, and the green light only a very few points—or only a half point more or less, perhaps—on her starboard. She takes this to be a vessel which does not see both her lights and therefore, in order to pass quite clear of her, she starboards (left rudder) a little. The other vessel * * * sees both her lights also, and that they are meeting vessels, and she ports her helm (right rudder). This is a very frequent cause of collisions. * * * " (Knight's Modern Seamanship, p. 405, quoting Dr. Sieveking).

The supposition that the above quotation describes the situation probable in the instant case is supported by the fact that Captain Cox admitted seeing the red and green lights of the Minerva, by the fact that Captain Gray testified he saw the green light of the Dauntless until she approached within 1000 feet of him when he began to see both her lights. The kind of approach described is indeed misleading, and the vessels were proceeding on such closely converging lines that, taking into consideration the yawing, the testimony of each captain that he did not move his wheel just prior to the collision is very likely true.

■ If this were the situation, there can be no question that a timely passing agreement, by blowing signals, would have avoided the collision. Common prudence would require the use of signals to reach an agreement under such circumstances. Since each flotilla was sighted by the other at least one half a mile distant, it was the duty of either to signal his intention under Pilot Rule III: "The signals for passing, by the blowing of the whistle, shall be given and answered by pilots, in compliance with the rules in this part, not only when meeting "head and head", or nearly so, but at all times when the steam vessels are in sight of each other, when passing or meeting at a distance within a half mile of each other, and whether passing to the starboard or port."

Neither vessel obeyed Rule III, and, as will be developed, their failure to do so directly contributed to the cause of the collision.

It is apparent that neither captain considered this approach to the problem. However, it is not a laborious task to find them both at fault on their own views of the circumstances.

Captain Cox asserted that he could see both red and green lights of the Minerva, alternately, and one Earl V. Davis, the mate on watch with him, testified, by deposition, that at times both lights could be seen together· Also, the Captain placed the Minerva at three quarters of a point to a point off the port bow of the Dauntless. Article 18, Rule I of the Inland Rules, 30 Stat. 100, Act June 7, 1897, 33 U.S.C.A. § 203, identical with Pilot Rule IV, was applicable. The Amolco, 1 Cir., 1922, 283 F. 890. According to this rule

"When steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other; and either vessel shall give, as a signal of her intention, one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other. But if the courses of such vessels are so far on the starboard of each other as not to be considered as meeting head and head, either vessel shall immediately give two short and distinct blasts of her whistle, which the other vessel shall answer promptly by two similar blasts of her whistle, and they shall pass on the starboard side of each other.

"The foregoing only applies to cases where vessels are meeting end on or nearly end on, in such a manner as to involve risk of collision; in other words, to cases in which, by day, each vessel sees the masts of the other in a line, or nearly in a line, with her own and by night to cases in which each vessel is in such ,a position as to see both the sidelights of the other."

■■ The failure on the part of Captain Cox to blow any signal constitutes fault. James McWilliams Blue Line v. New York & Cuba Mail S. S. Co., D.C· S.D.N.Y., 1930, 43 F.2d 586. Failure to reach a passing agreement constitutes mutual fault. The Radium, D.C.S·D.N.Y., 1934, 7 F.Supp. 804. Had a passing agreement been reached, the collision would have been avoided, but each navigator chose to divine the intention of the other. This has been frequently held to be mutual fault. See Chester A. Poling, Inc. v. United States, 2 Cir., 1932, 55 F.2d 921, 922.

■ Furthermore, the two flotillas approached on close quarters without appreciable change in bearing; they would have passed within 75 to 100 feet of each other. This would amount to "risk of collision" within the meaning of Article 18, Rule I of the Inland Rules (Pilot Rule IV). See The Milwaukee, E.D.Mich·, 1871, Vol. 17, Fed.Cas. No. 9,626, pp. 427, 430, 433; The Philadelphia, D.C. E.D.Pa., 1912, 199 F. 299. Therefore, both that rule and Pilot Rule III, quoted supra, are applicable. See The Gwynedd, 3 Cir., 1937, 91 F.2d 112·

■ Since Captain Cox admitted sighting the Minerva and her tow at a distance

of at least 3½ miles, it was his duty, as a measure of precaution, and under the rules, regardless of whether he considered it a "head and head" situation, to signal his intention to pass port to port within a half mile of the Minerva. That he considered it unnecessary because he felt certain of his position is not a proper excuse. The obvious purpose of the rules of the road respecting signals is to avoid collisions brought about by misunderstanding or inability to recognize correctly the course of an approaching vessel. Had Captain Cox blown a one blast signal, Captain Gray would not have persisted in his belief that a starboard to starboard pass was in the offing.

A similar offense is attributable to Captain Gray. Considering the situation to be that of a starboard to starboard pass rather than a head and head meeting, giving him the benefit of the doubt, he still came within Article 18, Rule I of the Inland Rules (Pilot Rule IV). Although he did sound a two blast signal, it was not until the vessels were about 500 feet, or at most, 1000 feet apart. This allowed, at most, something over a minute in which to maneuver the two heavily loaded and cumbersome flotillas. The required precautions should be seasonably adopted. The America, 1875, 92 U.S. 432, 23 L.Ed. 724. The delay of a signal constitutes fault. Henry DuBois Sons Co. v. A/S Ivarans Rederi, 2 Cir., 1940, 116 F.2d 492, certiorari denied 313 U.S. 568, 61 S.Ct. 942, 85 L.Ed. 1526. If signals are to be of any value they must be given with an allowance for sufficient time to exchange signals and agree on a passing, taking into consideration the speed, power and apparent agility of the vessels. The estimation of each captain that the situation was so clear no signals were necessary is exploded by the very fact that there was a misunderstanding.

Parenthetically, it may be suggested that when the Dauntless, showing her green light at 1000 feet, suddenly showed red and then green again, Captain Gray ought to have blown the danger signal and backed rather than blow two blasts and wait until the vessels were 400 feet apart to blow the danger signal. He was bound to stop until the course and movements of the Dauntless had been satisfactorily ascertained. The New York, 1899, 175 U.S. 187, 201, 20 S.Ct. 67, 44 L.Ed. 126.

Viewing the approach of the Dauntless from aboard the Minerva, according to Captain Gray, the former was something less than two points off the starboard bow of the latter. If the course of the Minerva were southwest, and the course of the Dauntless were NE by E½E, it is evident that the Dauntless was about 1½ points off the starboard bow of the Minerva. Under this set of facts, Article 18, Rule I of the Inland Rules (Pilot Rule IV) and Pilot Rule III apply. Very likely a port to port pass was required, for in the case of The Victory and The Plymothian, 1897, 168 U.S. 410 at page 418, 18 S.Ct. 149, at page 153, 42 L.Ed. 519, the Supreme Court said: "It has often been held, as a general rule of navigation, that vessels approaching each other in narrow channels, or where their courses diverge as much as 1½ or 2 points, are bound to keep to port, and pass to the right, whatever the occasional effect of the sinuosities of the channel." See also, The Amolco, supra.

While under this rule a port to port passing is normal in the "head and head" situation, one vessel is not entitled to assume that another will pass to the starboard until two whistles have not only been blown, but answered. The Sabine Sun, D.C.E.D.Pa., 1927, 21 F.2d 121, affirmed, 3 Cir., 1929, 33 F.2d 42; Chester A. Poling, Inc. v. United States, supra.

It may be noted in passing that if the Dauntless were on the outside of the west edge of the channel it was in violation of the Narrow Channel Rule (Inland Rules, Article 25, 30 Stat. 101, Act June 7, 1897, 33 U.S.C.A. § 210), since there is no evidence that it was unsafe or impracticable to be on her starboard side of the channel, and such navigation constitutes statutory fault. See Matton Oil Transfer Corporation v. The Greene, 2 Cir., 1942, 129 F.2d 618, 620.

The case for mutual fault is unassailable. The night of the collision was clear; visibility was good. Proceeding through a narrow channel, having made out each other at a great distance, and having determined their course, it was incumbent upon each officer to proceed with caution, obeying all the rules of the road. Nevertheless, it is apparent from the record that neither navigated with respect to the other until too late to avoid colliding. Captain Cox repeatedly stated that he paid no attention to the Minerva and

890

Captain Gray stated that he did nothing until he approached within 1000 feet, when he blew the two blast signal. As the Supreme Court said long ago, "Sailing rules were ordained to prevent collisions * * and not to enable those whose duty it is to adopt, if possible, the necessary precautions to avoid such a disaster, to determine how little they can do in that direction without becoming responsible for its consequences, in case it occurs." The America, 1875, 92 U.S. 432, 23 L.Ed. 724.

True, both captains were "certain" of each other's intention but such certainty was not warranted under the circumstances. As stated in A. H. Bull S. S. Co. v. United States, 2 Cir., 1929, 34 F.2d 614, at page 616: "Masters who choose to divine the purposes of other vessels and keep on, may avoid the charge of overcaution, but they take their chances. If they escape, well and good; if they fail, their owners pay."

As a final matter, it is urged that the Dauntless and the Gretchen were further at fault in not having a proper lookout on the Gretchen, and in not having proper lights on that vessel. Since the Minerva and her tow were sighted by Captain Cox and his mate at least 3½ miles away, and since it is not denied that the signals blown were heard, the lookout would have contributed nothing to the eyes and ears of the ship. See Puratich v. United States, 9 Cir., 1942, 126 F.2d 914. Moreover, Captain Gray and his lookouts made out the Dauntless and her tow at least a half mile away, and it does not appear that improper lights, if any, on the Gretchen contributed to the collision.

Accordingly, I state the following conclusions of law:

1. The Gretchen was under the charge and direction of the Dauntless No. 12 and committed no independent fault.

2. The Minerva was at fault in failing to blow a proper passing signal at a seasonable time.

3. The Dauntless No. 12 was at fault in failing to blow a proper passing signal at a seasonable time.

4. The Minerva, her owners and stipulators, and the Dauntless No. 12, her owners and stipulators, were in mutual fault and are liable to the Gretchen for its damages.

An order may be submitted in accordance with this opinion.