## UNITED STATES v. ERIE R. CO.

### WILSON et al. v. SAME.

(Circuit Court of Appeals, Sixth Circuit. July 14, 1909.)

Nos. 1,827, 1,830.

1. Collision (§ 20*)—Duty of Vessels to Avoid Collision—Observance of Rules.

All navigation rules pertinent to a given situation are to be construed together, and while each of two approaching vessels has the right to expect the other to navigate in accordance with the rules, or a passing agreement, when it becomes evident that either is not doing so it is the duty of the other to navigate accordingly and take such measures as may seem necessary to avoid a collision.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 17; Dec. Dig. § 20.*]

2. Collision (§ 40*)—Steam Vessels Crossing—Both Vessels in Fault.

A collision occurred in the daytime in calm and clear weather on Lake St. Clair between the steamers Hancock and Binghampton. The vessels were on crossing courses, the Binghampton having the Hancock on her starboard side, and therefore required by rules 18 and 20 of Act Feb. 8, 1895, c. 64, 28 Stat. 648, 649 (U. S. Comp. St. 1901, p. 2891), to keep out of the way, while the Hancock kept her course and speed, and a passing agreement was made in accordance with such rules. The Hancock, however, almost immediately began to slow down, and finally reversed, while the Binghampton kept her speed under a port helm until she struck and sunk the Hancock. *Held,* that both vessels were in fault; the Hancock for not keeping her speed as required by the rules and her agreement, and the Binghampton for not sooner observing that the Hancock had practically stopped and governing her own course accordingly, as required by rule 27.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 40; Dec. Dig. § 40.*]

Appeal from the District Court of the United States for the Eastern District of Michigan.

This was a libel in admiralty of the United States of America, as owner of the steamship Hancock, against the steamer Binghampton, of Buffalo, to recover damages sustained by a collision occurring August 15, 1905, between the two vessels in Lake St. Clair. The Erie Railroad Company, appellee, appeared and claimed exclusive ownership of the Binghampton, accepted service of the writ, and waived formal seizure, and thereupon filed its answer. An intervening libel was filed by the master and others of the crew of the Hancock and certain engineers aboard at the time of collision, to recover for loss of personal effects. The Hancock was employed at the time in surveying for purposes of the ship channel, in pursuance of an act of Congress.

Among averments of the libel is one in explanation of the conduct of the Hancock after a passing agreement had been made between her and the Binghampton. It states:

"Immediately after the said signal had been exchanged, the vessels were about 1,500 feet apart, each holding its said course and speed. That the said vessels so continued upon their said courses and speed, until they were about 200 feet apart. That it then clearly appeared that if the said vessels should further continue their respective courses and speed, collision between them would be unavoidable, and the Binghampton not checking her speed or materially altering her course, the master of the Hancock, in order to avoid such collision, then and thereupon signaled his engineer to stop and back the Hancock, which the said engineer immediately did. That the Binghampton still maintaining her speed of about 12 miles an hour, then and about

then, sheered about one point towards the stern of the Hancock, and, immediately thereafter, continuing at the same speed, straightened up on her former course; the Hancock continuing to back. That almost immediately thereafter the Binghampton" struck the Hancock, sinking her.

In an amended answer of appellee, it was, in substance, averred that, when the Binghampton assented to the passing agreement, she promptly put her wheel hard aport, and had started swinging well to starboard, without anything to indicate that the ships would not clear until they were in close proximity, when it appeared to the Binghampton that the Hancock was not "head reaching as fast as she had been. Directly thereafter the Hancock sounded two blasts on her large whistle. In the positions the boats then were, with the Binghampton swinging to go under the Hancock's stern, it was impossible for the Binghampton's starboard swing to be stopped sufficiently to alter her undertaking and go contrary to the passing signals as originally initiated by the Hancock. The Binghampton thereupon immediately reversed strong, * * * and with the Hancock also apparently backing strong, the two boats came together. * * * That the little steamer filled and sank in about five minutes. The Binghampton was uninjured in the impact."

Appellee also filed answer to the intervening libel of the master and others, in form substantially the same as its answer to libelant. Upon trial on pleadings and proof, the court below ordered that the original libel and also the intervening libel be dismissed. Appeals were allowed in favor of both libelant and intervening libelants. It is agreed in the briefs of counsel that of the rules of navigation contained in Act Cong. February 8, 1895, c. 64, 28 Stat. 645 (U. S. Comp. St. 1901, p. 2886), 2 Fed. Stat. Ann. 167, rules 18, 20, 21, and 23 are involved; and counsel for libelant claims rules 27 and 28 also to be involved. The assignments of error concern the navigation of the two vessels after their passing agreement was made.

F. H. Canfield, for appellants.

J. C. Shaw, for appellee.

Before LURTON, SEVERENS, and WARRINGTON, Circuit Judges.

WARRINGTON, Circuit Judge (after stating the facts as above). The collision between the Hancock and the Binghampton resulted in sinking the Hancock while engaged in surveying for purposes of the ship canal of Lake St. Clair. The boundaries of the space under survey were marked by two lines of buoys bearing serial numbers; the width between these lines being about 3,500 feet. The object of the survey was to take soundings. This was done by means of a bathometer attached to the Hancock. The instrument automatically recorded the depth of the channel and the speed of the Hancock as she was moved back and forth between the lines of buoys. When the Hancock was near buoy 98 and bound across the channel in a northwesterly direction for buoy 97, the Binghampton was bound up the channel on the usual course N. E. ½ E., and was from one-half to three-quarters of a mile below the Hancock. The vessels were thus approaching on crossing courses; the Hancock having the Binghampton on her port hand, and, of course, the Binghampton having the Hancock on her starboard hand. When the vessels were relatively so located, the Hancock sounded a signal of one blast, indicating her own course to the Binghampton, and insisting that the Binghampton should pass under the starboard rule. At that time the steamer Majestic, bound down the channel, was in such position as to prevent the Binghampton from making immediate reply to the signal of the Hancock without confusing the Majestic. When the Binghampton was nearly abreast with

the Majestic, she assented to the signal of the Hancock by sounding one blast of the whistle. At that time the distance between the Binghampton and the intersection of the crossing courses of the two vessels was variously estimated, but was probably a little less than 2,000 feet. The distance at that time between the Hancock and such intersection is likewise uncertain, but perhaps was about one-half the distance of the Binghampton from such point. The Binghampton is a large freight vessel, 285 feet in length, and with her load had a draft of about 9 feet forward and about 14 feet aft. The Hancock was a steamer of 100 feet in length and between 7 and 8 feet draft. The speed of the Binghampton was 11 miles an hour and that of the Hancock about 5½ miles.

If the distances before mentioned could be relied on as approximately correct, it is plain that the two vessels by keeping the passing agreement could have been easily and safely so navigated as to avoid a collision. When the Binghampton responded to the Hancock with a one-blast signal, she announced under the rule, "I am directing my course to starboard"; while the Hancock was under the rule required "to keep her course and speed." But we need not rely upon the evidence as to the relative distances of the two vessels from the intersection of their sailing lines. The passing agreement committed the navigators of the vessels to the proposition that the vessels could safely pass, and their masters so testified. When it is considered, then, that the collision occurred in broad daylight, in clear weather, with very light wind, and with abundant room to maneuver, gross carelessness becomes manifest. In the presence of these admitted conditions, it might naturally be expected that the evidence would distinctly point out and locate the faults which brought about the collision. However, examination of the record and the briefs shows the evidence on a number of important points to be very conflicting and hard to reconcile. It was said by Mr. Justice Brown, in The Albert Dumois, 177 U. S. 240, 249, 20 Sup. Ct. 595, 599, 44 L. Ed. 751:

"In short, the conditions were all favorable to safety, and the collision could not have occurred without egregious fault on the part of one or both vessels. In endeavoring to locate this fault we are at liberty to consider the movements of each vessel from its own standpoint, and without attempting to reconcile the conflicting statements of the two crews, or to settle disputed questions of fact, to inquire upon the showing made by each whether that vessel was guilty of fault contributing to the collision."

It is alleged in the libel, as pointed out in the statement, that as the vessels approached the point of disaster, the master of the Hancock, "in order to avoid such collision, * * * signaled his engineer to stop and back, * * * which the said engineer immediately did; * * * the Hancock continuing to back." The proctor for libelant insists that the Binghampton brought about conditions which were attended with such danger and imminent peril, as in the judgment of the master of the Hancock required stopping and reversing as a matter of self-preservation; and, further, that when rule 20, requiring the privileged vessel to keep her speed, is read in connection with rule 27, imposing due regard to all danger of collision and special circumstances

rendering a departure from the rules necessary to avoid imminent danger, the master was not violating, but was complying with, the rules.

The stopping and reversing being thus admitted, the first question is whether the master of the Hancock, at as early a stage as practicable, discerned and sought to avert the conditions making for danger which finally resulted in disaster.

The master of the Hancock testified that he had the Binghampton in view and gave close attention to her from the time of receiving her reply signal until the vessels collided. He thought, at the time the Binghampton answered his signal, she was from 1,500 to 2,000 feet from the Hancock. He testified that, when he saw the Binghampton swing to starboard, he had already stopped his engine without signal to the Binghampton. It is doubtful how far the Binghampton had progressed when he noticed her swinging to starboard. Indeed, it is uncertain when or how much her wheel was ported, or when in her progress she began to swing to starboard. While not unmindful of the rule that the testimony of officers as to what was actually done on board of their own ship is entitled to greater weight than that of witnesses on other vessels (The Alexander Folsom, 52 Fed. 403, 411, 3 C. C. A. 165), yet the circumstances, including the fact of collision, are convincing that the wheel of the Binghampton could not from the time of her reply signal have been put and kept hard aport; but we think her wheel was in some degree ported, and that she began to swing to starboard at an earlier time than that observed by Wilson, master of the Hancock.

If, then, we accept Wilson's testimony that he was vigilant in watching the Binghampton, and that he had stopped his engine before he saw the Binghampton swing to starboard, the reason for so stopping and for failing to give timely notice to the Binghampton is not explained. Wilson also claims to have given a signal to his own engineer to reverse his engine, when the Binghampton was within 200 to 300 feet of the Hancock; but he says that his own ship had then come to a practical standstill, which he explained to signify a speed of one-half mile an hour. Manifestly it took some time and distance to reduce his original speed of 5½ miles to ½ mile an hour.

It necessarily follows, as it seems to us, that if Wilson did observe a change to starboard of the Binghampton at a stage materially earlier in her progress than that stated by him, and nevertheless checked or stopped his engine without signal of any kind to the Binghampton, he was guilty of neglect. If, on the other hand, the Binghampton did not make any change in her course until she was within practically her length of the Hancock, Wilson should at an earlier stage have seen that she was guilty of a departure from the rule requiring her to keep out of his way, and should have taken seasonable precautions through signal and otherwise to avert a collision. We are therefore of opinion that the Hancock was in fault. But was she alone in fault? In view of the experience of the court below in determining causes in admiralty and of the fact that the witnesses appeared before the court, as well as before the inspectors, we hesitate to express our belief concerning the Binghampton.

· Of course, if the Hancock were solely at fault, as held below, the rule of law as stated in the opinion under review and the authorities there relied upon, would be applicable and controlling; but if both vessels were in fault, and the fault of each was a concurrent cause of the collision, the first one of those decisions would require the damages to be divided. The Pennsylvania, 19 Wall. 126, 137, 22 L. Ed. 148. The other cases are not apposite, if both vessels were in fault; but decisions alluded to by counsel for appellee and cited in Belden v. Chase, 150 U. S. 674, 14 Sup. Ct. 264, 37 L. Ed. 1218, are the same as the one in The Pennsylvania, where both vessels concurred in bringing about the collision. The Agra, L. R., 1 P. C. 501; The General Lee, Irish Rep. 3 Eq. 155.

Was the Binghampton in fault? What has been said in respect of the conduct of the Hancock will necessarily have a bearing on what must be said in regard to the Binghampton. Indeed, the relation of the evidence to both vessels makes it difficult to speak of either without involving the other.

Capt. Gebhard, master of the Binghampton, testified that, when the Hancock gave her signal of one blast of the whistle, his ship was about ¾ of a mile below the Hancock and was 300 feet west of the sailing line. He further states that the Hancock at that time was 700 or 800 feet east of his course. This placed the Hancock at that time 400 or 500 feet east of the sailing line. He says, however, that the collision occurred at a point about 400 feet "to the eastward of the sailing line." Gebhard thus states that, between the time the Hancock blew her one blast and the time of the collision, the Hancock had either not moved at all, or at most had moved only 100 feet on her course. If these estimates be at all reliable, the Hancock must have been stopped almost immediately after she gave her signal blast, because Gebhard himself says elsewhere that she was moving at that time at four or five miles an hour.

Now, as Gebhard describes the situation at the time his ship gave her reply signal, she was between one-quarter and a half mile below the Hancock, and he says her wheel was put over hard aport almost immediately thereafter; but if we understand his testimony, as just pointed out, the Hancock had not kept her speed. If this hypothesis were accepted, it would, to say the least of it, challenge the wisdom both of accepting the Hancock's one-blast signal and of placing the wheel of the Binghampton hard aport. Gebhard and his first mate, Dorn, both of whom were responsible for delivering the reply signal, knew that the Hancock was obligated to keep her speed, and that the Binghampton had agreed to pass astern of the Hancock and keep out of her way. Could these officers of the Binghampton close their eyes to the situation or movements of the Hancock?

Dorn appears to have given the reply signal of the Binghampton and the order to place its wheel hard over to port, and Gebhard approved of this. Gebhard stated that the situation as he saw it did not require any violent porting on his boat. He reached the top of the pilot house, just after Dorn had given the reply signal, and said that he (Gebhard) "stood there watching the Hancock." After stating that his boat was swinging at a "very lively gait," he described a sit-

uation indicating a sudden awakening in him to conditions that must have consumed time in forming. He said:

"I got up within I should judge a couple of lengths of him, and the fellow did not seem to be going ahead as he ought to. Well, I sung out in a very loud voice, 'Why in hell don't you go ahead with your steamboat?'"

He was then asked whether the Hancock was going four or five miles an hour. He answered:

"Oh, no, he was not. Q. State whether he was going at all. A. He didn't look to me as though he was moving any."

Raymer, wheelsman of the Binghampton, testified before the inspectors, that he was "keeping lookout on the Hancock's movements" after he received the order to hard aport. After stating that the Binghampton seemed to be heading near the bow of the Hancock, he said:

"The Hancock seemed to be stopped, or something, I thought, until the last swing, she went under" the bow of the Binghampton.

McDowell, the lookout on the Binghampton and standing in the "eyes of the ship," testified that, when the signal of the Hancock was sounded twice (it being doubtful whether this was from the engine whistle or the deck whistle), the Hancock appeared to him to "be backing up, for the water was running ahead on her," and Dorn said the same thing.

There must be added to all this the fact that the speed of the Binghampton was not slackened from the time the reply signal was given until the sounding of the two whistles either from the engine or the deck of the Hancock, save only through the retarding effect of porting her wheel; nor at that time was any signal given by the Binghampton or anything else done by her after porting her wheel, which looked to safety in passing the Hancock.

It is true that Capt. Gebhard says that he was watching the Hancock, just as Capt. Wilson says that he was watching the Binghampton; but why did not Gebhard, or his mate, or his wheelsman, or his lookout, make earlier discovery than they claimed they did of the movements of the Hancock? There was a consensus of opinion among those in charge of the Binghampton that if the Hancock had kept her speed no collision could have happened.

The course of the Hancock was across that of the Binghampton, thus giving the Binghampton the surest means of testing the progress of the Hancock, no matter how much or how little the wheel of the Binghampton was ported. The time consumed by the Binghampton in reaching the point of danger, although in one sense short, must have been abundant for experienced men, claiming to have been keenly alert, to gauge the movements of the Hancock. Why should not those watching from the Binghampton have noticed the slowing down of the Hancock to her "standstill"—the reduction of her speed from about five miles to one-half mile an hour? Her speed could have been slackened only gradually; and, as we understand the evidence, she was being slowed down before the order to reverse her engine was given. It is scarcely credible that such change of speed should not have been sooner detected. Capt. Gebhard's impression of distances between the ves-

sels, and between the vessels and the sailing line, at the time of the Hancock's one-blast signal, as before pointed out, should have excited his attention concerning the location and movements of the Hancock, at the time of his reply signal.

It is to be observed that Capt. McIntosh of the Majestic, moving in an opposite direction, was so far impressed with the idea that a collision would occur, as to keep the two vessels in view until they collided. He testified that he gave an order to his wheelsman to starboard, and that he started to come around, before he heard the two whistles of the Hancock. Why should his suspicions of danger have been so aroused, while the captains of the two approaching vessels remained so long oblivious? The very direction of the Binghampton, together with the position of the Hancock, should have excited caution and care on the part of the masters of both vessels, for it appears that the Binghampton was headed toward one portion or another of the Hancock nearly if not quite all the time.

It is claimed, however, by both sides, that each was entitled to rely upon the observance of the rules by the other. It is true that the rules of navigation are statutory, and that the courts are, as they ought to be, insistent upon the observance of such rules, and reluctant ever to allow the introduction of an exception. However, all rules that are pertinent in a given situation should be considered and construed as a whole. It therefore was not for the Binghampton to rest supinely upon the duty of the Hancock to keep her speed, if the officers of the Binghampton either saw, or by the exercise of reasonable caution could have seen, that the Hancock was not doing so. Nor could the master of the Hancock shut his eyes to the maneuvers of the Binghampton or its failure to maneuver, and so rely upon her keeping out of his way, if by similar caution he could seasonably have discovered her failure to do so and have provided against it.

It is, not meant to say that recovery would be accorded to a ship whose master departs from the obligation of a passing agreement and the rule involved under it, while the master of another approaching ship prudently and faithfully keeps his agreement and observes the rule. What we are considering is a case of negligent departure and failure, concurring in the conduct of both masters. There can be no difference, upon the hypothesis and the point now under discussion, as it seems to us, between a case involving a passing agreement and a case where such agreement has been declined, or for any reason has not been made; for that would be to accord greater sanctity to the agreement, than to the law.

The Albert Dumois, cited above, presented the question, among others, whether recovery could be had by the owner of a steamer, the Argo, where his steamer and the other steamer, the Dumois, "approached end on or nearly end on," and the signal of neither was accepted by the other, and the Argo, in the face of apparent departure from the rule by the Dumois, continued her speed until she sank in the collision that followed. Both vessels were found in fault and the damage divided. Mr. Justice Brown said (page 253 of 177 U. S.; and page 600 of 20 Sup. Ct. [44 L. Ed. 751]): .

"This court has repeatedly held the fault, and even the gross fault of one vessel, does not absolve the other from the use of such precautions as good judgment and accomplished seamanship require. The Maria Martin, 12 Wall. 31, 20 L. Ed. 251; The America, 92 U. S. 432, 23 L. Ed. 724; The Lucille, 15 Wall. 676, 21 L. Ed. 247; The Sunnyside, 91 U. S. 208, 23 L. Ed. 302."

After commenting on the decision in The Britannia, 153 U. S. 130, 14 Sup. Ct. 795, 38 L. Ed. 660, from which the learned justice had dissented, he said (page 254 of 177 U. S., and page 601 of 20 Sup. Ct [44 L. Ed. 751]) :

"Now, as it appears from the testimony of the Argo's crew that they not only heard the signal of two whistles from the Dumois, but saw her turn under her starboard wheel, and exhibit her green light when she should have ported, they were at once apprised of the fact that she was violating a rule of navigation, and that prompt action was required to avoid a collision. * * * We are of opinion that the Dumois was primarily in fault for this collision, in starboarding instead of porting when she first sighted the Argo: and, while the case with respect to the Argo is by no means free from doubt, the majority of the court are also of opinion that the Argo was in fault for failing to observe the twenty-first rule, which required her to stop when risk of collision was involved. * * *"

Hall v. Chisholm, 117 Fed. 807, 813, 55 C. C. A. 31, 37, involved a question of duty under circumstances disclosing nonobservance of rules and consequent danger of collision. Judge (now Mr. Justice) Day, said :

"No matter how flagrant the fault of the navigators of the raft may have been, that would not excuse the Wade from adopting every proper precaution to avoid a collision after it became apparent that it was likely to occur."

In Lake Transp. Co. v. Gilchrist Transp. Co., 142 Fed. 89, 73 C. C. A. 313, this court recognized the rule that prompt and decisive measures must be taken to avoid collision where violation of a passing agreement is apparent. When distinguishing the case of The Elphicke, 123 Fed. 405, 59 C. C. A. 286, Judge Lurton said (page 97 of 142 Fed., and page 321 of 73 C. C. A.) :

"The collision involved in that case between the Poe and the Elphicke occurred in broad daylight. The Poe saw that the Elphicke was not doing her duty, and 'was out of her proper place and taking measures to right herself'; but she depended upon the Elphicke being able to retrieve her fault, and refused to vary her own course. It was a clear case of apparent danger of collision with time to avoid it."

Again, in the Elphicke Case, Judge Severens said (page 406 of 123 Fed., and page 287 of 59 C. C. A.) :

"The law gives no countenance to such perversity, but, on the other hand, exacts of each vessel that, notwithstanding the errors of the other, it shall to the end do all in its power to avoid the consequences of the fault."

The Delaware, 161 U. S. 459, 467, 16 Sup. Ct. 516, 520, 40 L. Ed. 771, involved a discussion of the mutual rights and duties of steamers approaching each other as here upon crossing courses. The preferred steamer, the Talisman, kept its course and speed—exactly opposite conduct from that of the Hancock. The Talisman was found blameless and the Delaware in fault. Mr. Justice Brown said :

"The main fault charged upon the Talisman, however, is that of not stopping and reversing, when the failure of the Delaware to take measures to

avoid her became apparent. In The Britannia, 153 U. S. 130, 14 Sup. Ct. 795, 38 L. Ed. 660, which was also a case of a starboard-hand collision, the preferred steamer, the Beaconsfield, was held to have been in fault for stopping and reversing under similar circumstances—in other words, for doing what it is claimed the Talisman should have done in this case.    Two members of the court dissented upon the ground that the Beaconsfield, having been brought into a position of peril by the negligence of the Britannia, was not in fault for stopping and reversing; the substance of their opinion being that, under such circumstances, the master might exercise his judgment as to the best method of avoiding a collision, and that an error in judgment should not be imputed to him as a fault.    In neither opinion, however, was it intimated that, if the Beaconsfield had kept her speed, she would have been in fault for so doing.  *  *  *    The divergence between the authorities begins at the point where the master of the preferred steamer suspects that the obligated steamer is about to fail in her duty to avoid her.  *  *  *    The cases of The Britannia, 153 U. S. 130, 14 Sup. Ct. 795, 38 L. Ed. 660, and The Northfield, 154 U. S. 629, 14 Sup. Ct. 1184, 24 L. Ed. 680, must be regarded, however, as settling the law that the preferred steamer will not be held in fault for maintaining her course and speed, so long as it is possible for the other to avoid her by porting, at least in the absence of some distinct indication that she is about to fail in her duty."

We are constrained to hold that the Binghampton was in fault through the failure of her master, in performance of his duty to keep out of the way of the Hancock, and. to avoid risk of collision, earlier to discover the change in conditions as they existed at the time of assent to the Hancock's one signal on her whistle, and for failure thereupon materially to slacken the speed of the Binghampton and stop and reverse her engines before coming into close proximity to the Hancock.  The Binghampton thus violated rules 18, 21, and 27.  The faults found as to the two vessels were concurrent in causing the collision.

The result is that the damages must be divided.

The decree therefore in each appeal is reversed, and each cause is remanded, with an order of reference as to each to ascertain the damages.