### DULUTH S. S. CO. v. PITTSBURG S. S. CO.

(Circuit Court of Appeals, Sixth Circuit. July 13, 1910.)

No. 2,027.

COLLISION (§ 40*)—STEAM VESSELS MEETING—MUTUAL FAULT.

A collision occurred at night on Lake Superior between the steamer Sylvania, going down, and the steamer Bessemer, going up. The vessels saw each other when three-fourths of a mile apart, each having the other about one-half point on her starboard bow and showing her green light. At that time they exchanged a passing signal of one whistle, but the Sylvania proceeded on her course or under a starboard wheel and continued to show her green light to the Bessemer until just before collision, and too late to avoid it, while the Bessemer proceeded under a port wheel. *Held*, that the Sylvania was in fault for navigating contrary to the agreement; that the Bessemer was also in fault for not stopping and giving alarm signals when it became apparent that the Sylvania was so navigating; and that it involved at least danger of collision, which was shortly after the first exchange of signals.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 40.*]

Appeal from the District Court of the United States for the Northern District of Ohio.

Suit in admiralty by the Pittsburg Steamship Company against the Duluth Steamship Company, and cross-libel. Decree for libelant, and respondent appeals. Decree modified.

This is a libel in admiralty of the Pittsburgh Steamship Company against the Duluth Steamship Company in the United States District Court for the Northern District of Ohio, growing out of a collision of two vessels.

The libel, the answer thereto, and a cross-libel were filed. Much evidence was taken in the form of depositions, and the case was heard before the district judge. Final decree was entered in favor of the libelant, holding that the steamer Sir Henry Bessemer was without fault, and that the steamer Sylvania was solely at fault for the collision, and judgment accordingly, and dismissing the cross-libel. From this decree an appeal was taken by the libelee and cross-libelant, and the case is now heard upon this appeal.

Stated generally, the facts are that about 1 o'clock, on the morning of June 13, 1905, a collision occurred in Lake Superior between the steamer Sylvania, the property of the appellant, and the steamer Sir Henry Bessemer. the property of the appellee, resulting in damage to both vessels, as alleged in their respective libels. The Sylvania was down-bound, steaming in a south-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes

erly direction, and heavily laden. The Bessemer was up bound, steaming in a northerly direction, without cargo. In the early part of the night, and up to a short time before the collision, both vessels had been navigating in a thick fog, necessitating the sounding of their fog signals regularly. Some 30 minutes prior to the collision, the fog lightened, so that it was possible to see about three-quarters of a mile ahead, when the crew of the Bessemer sighted a steamer going in the same direction, and slightly on her starboard bow. This steamer proved to be the John B. Trevor, which was also the property of the appellee. The Trevor and Sylvania reached a passing agreement, which was to pass port to port. To execute this agreement, the Trevor changed her course 2½ points to starboard, which course was maintained until a point was reached, when she with safety could straighten up and pass the downbound Sylvania. This latter vessel, when sighted by the Trevor, was heading diagonally across the bow of the Trevor, passing from her starboard to her port side, and apparently she did not change her course until she was crossing the Trevor's bow, when she straightened up, passing the Trevor in opposite directions, on substantially parallel lines, from 500 to 800 feet apart. It was when the Sylvania was crossing, or had just crossed, the bow of the Trevor that the Sylvania and Bessemer sighted each other. The colliding vessels were then three-quarters of a mile apart. The Sylvania was 504 feet keel, and the Bessemer 413 feet keel. They were navigating from 7 to 12 miles per hour, approaching each other almost head on.

The range lights are white and situated above the boat, one higher than the other; the lower one being near and above the bow, and the higher one further astern. When approaching the vessel head on, these two lights are closed; that is, in line. As the vessel turns from this position, these lights open, and their relation each to the other aids the navigator in determining her position and course. There are also a red light and a green light. They are situated on the opposite sides of the bow of the vessel. The red light is on the left or port side. The green light on the right or starboard side. A correct understanding of the relative positions of these lights will materially aid in the proper understanding of the case.

Frank S. Masten and Harvey D. Goulder, for appellant.

Hermon A. Kelley, for appellee.

Before WARRINGTON and KNAPPEN, Circuit Judges, and McCALL, District Judge.

McCALL, District Judge (after stating the facts as above). When these colliding vessels became factors in their proper navigation in relation to each other, it was their plain duty to have reached a passing agreement by the exchange of signals for that purpose. But this they failed to do. The Sylvania introduces evidence tending to show that she attempted to establish an agreement with the Bessemer to pass starboard to starboard from the time that she picked up the lights of the Bessemer until the collision became imminent, and had sounded a two-blast signal for that purpose three times, but received no response from the Bessemer. This evidence is contradicted by the crews of the Bessemer and Trevor. The Bessemer introduces evidence tending to show that she had reached a passing agreement with the Sylvania to pass port to port by exchanging one-blast signals with the Sylvania as often as four times, but that the Sylvania continued to steer her course contrary to this agreement. The court below took the view insisted upon by the appellee, and held that the collision was occasioned solely by the fault of the Sylvania. We agree with the trial court to the extent only that the fault of the Sylvania contributed in part to the collison.

A more difficult question arises, however, as to the trial court's action in holding that the Bessemer was not guilty of any negligence that contributed to the collision. The testimony of the crew of the Trevor throws but little light on the situation. Their testimony is that the two colliding vessels exchanged only one single blast signal, and that occurred when the Sylvania was abreast of the Trevor.

The crew of the Bessemer testify that she and the Sylvania exchanged four single blast signals, while the crew of the Sylvania testify that she sounded three two-blast signals, and exchanged only one single blast signal with the Bessemer, and this was just a few moments before the collision. We shall not further notice the evidence of the crew of the Trevor, nor that of the Sylvania in determining the question of negligence on the part of the Bessemer, but base the decision of that question alone on the testimony of the Bessemer's crew, and it shows substantially the following facts: These vessels were three-quarters of a mile distant from each other when first sighted. They were approaching nearly head on, perhaps each was slightly on the starboard quarter of the other. The Sylvania was passing, or had just passed, the stern of the Trevor, showing her green light to the Bessemer, and continued showing her green light until within two lengths from the Bessemer. During this time the two vessels were exchanging one-blast passing signals, and yet the master of the Bessemer saw that the Sylvania was being managed as if under a two-blast signal; that is, steering her course to her left or port side contrary to the signals which the crew of the Bessemer say were exchanged.

The Sylvania had proceeded from a point three-fourths of a mile away to within a length and a half or two lengths of the Bessemer, under an agreement to pass port to port, while all the time she was moving in a direction contrary to the passing agreement, and across the bow of the Bessemer, which had begun to change her course to starboard on exchange of the first passing signal, and up to a few moments before the collision she had swung four points to starboard. The Sylvania was not steered in accordance with the agreement until within a length or two lengths away, when she changed her course, in an attempt to pass port to port. It was then too late, and the collision occurred. When the Sylvania was opposite the stern of the Trevor, she showed her green light to the Bessemer. She was moving as if under a two-blast passing signal, down across the bow of the Bessemer, but exchanging one-blast signals, according to the testimony of the Bessemer crew.

It must have been clear to the Bessemer that something was radically wrong with the Sylvania, or that there was a grave misunderstanding as to the passing agreement, and yet the Bessemer did not stop or blow an alarm signal. "In order to determine where the fault lies, it usually becomes necessary to examine with care the conduct and orders of those in charge of the respective vessels from the time the vessels came in sight of each other to the time they came together." The Wenona, 19 Wall. 41, 22 L. Ed. 52. This rule is important here. When the colliding vessels became factors in their proper navigation with relation to each other, they were three-quarters of a mile

apart. Each of them had the other on her starboard quarter about one-half point. Had this relation continued, the vessels would have passed starboard to starboard in safety. The Sylvania was abreast of the Trevor when the second one-blast signals were exchanged, showing her green light to the Bessemer, when on the Trevor's stern, according to the witness, Capt. Hoag, of the Bessemer. He was then asked as follows:

"Q. If the Sylvania was making the course that you have described, would not that indicate danger to you? A. It did when she showed her green light; not before that.

"Q. You could see that she (Sylvania) was swinging by her lights, couldn't you? A. Yes, sir.

"Q. Quite contrary to her signals? A. Yes, sir.

"Q. And then she proceeded in that course from the time she was abreast of the Trevor, at least until just before the collision, when you say you saw her swing slightly, as if under a port helm? A. Yes, sir.

"Q. Where was she when she showed her red light? A. About a length and a half off, a length anyway."

Under these conditions, the Bessemer did not stop nor blow the danger signal.

Witness Bugge, mate of the Bessemer, says that he exchanged one-blast signals with the Sylvania the second time when she was abreast of the Trevor. The third time a little past the Trevor, when she was swinging on here starboard wheel.

He then said to the master:

"There is something wrong with that fellow. He is swinging on his starboard wheel, instead of on his port wheel, I believe.

"Captain: Yes; I believe he is, we will have to stop and back.

"Mate: Yes; we will."

But he did not stop, for the mate says about that time he blew the fourth signal, and then said to the master:

"We will have to back. He is swinging and we will never clear him.

"Captain: All right, back her."

The master and mate of the Bessemer substantially corroborate each other in their testimony, which clearly shows that danger was apparent all this time, and yet the Bessemer was not stopped, nor danger signals given. "The lesson that steam vessels must stop their engines in the presence of danger, or even of anticipated danger, is a hard one to learn, but the failure to do so has been the cause of the condemnation of so many vessels that it would seem that these repeated admonitions must, ultimately, have some effect." The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126.

What was the Bessemer's duty under her own testimony? The master of the Bessemer saw that the Sylvania was not doing her duty under the passing agreement which he says had been reached, and that, if her course was kept up, a collision was inevitable, yet he relied upon the Sylvania to change her course so as to pass according to the agreement as the Bessemer understood it, and he continued to rely upon the Sylvania to avert the accident, until it was too late for either to do so.

To the Bessemer it was a clear case of apparent danger of collision,

with time to avoid it. She could have stopped or blown the danger signal when it was first apparent that the Sylvania was less than three-quarters of a mile away, moving rapidly, and in violation of the passing agreement. U. S. v. Erie R. R. Co., 172 Fed. 50, 96 C. C. A. 538; Hall v. Chisholm, 117 Fed. 807, 55 C. C. A. 31; Lake Transportation Co. v. Gilchrist Transportation Company, 142 Fed. 89, 73 C. C. A. 313; The Elphicke, 123 Fed. 405, 59 C. C. A. 286. As has been seen, it appears that the crew of the Bessemer heard the signal of one blast from the Sylvania when three-quarters of a mile away, which was twice repeated. She was showing her green light, when she should have taken the opposite course and shown her red light. The Bessemer was apprised of the fact that the Sylvania was violating a rule of navigation, and prompt action was required to avoid a collision. "Nothing is better settled than that if a steamer be approaching another vessel which has disregarded her signals, or whose position or movements are uncertain, she is bound to stop until her course be ascertained with certainty." The New York, supra.

And again:

"And if the vessels shall have approached within half a mile of each other, both shall reduce their speed to bare steerageway, and, if necessary, stop and reverse." Rule 26 of the White Law.

If it were permissible for those responsible for the navigation of a great vessel having in their care human life as well as property to speculate as to whether they should adopt the safest course or one less safe, when both are equally open to them in the face of real or apparent danger, perhaps the Bessemer under all the facts should escape liability in this case. But such speculation should not be tolerated nor excused. Navigation is fraught with such great danger both to life and property that it would be most hazardous if the courts should approve a rule of action less exacting than that which requires of the officers of vessels when in the face of danger, real or apparent, in all cases, if within the range of possibility, to promptly adopt that course that is the safest and which offers the greatest assurance of avoiding such danger.

A careful examination of the evidence in this case leads to the conclusion that the Bessemer was also guilty of negligence, which contributed to the collision in not stopping and reversing her engines before the vessels came so close together that it was impossible to avoid the accident, and in not blowing the alarm signal. Both vessels were guilty of faults which were concurrent in causing the collision.

The decree below, in so far as it holds that the Bessemer was without fault, will be reversed. In so far as it decrees that the collision was occasioned solely by the negligence of the Sylvania, it will be modified in accordance with the views expressed in this opinion, and the case remanded with directions to ascertain the damage sustained by the Sylvania, and the total amount of damage to both vessels will be divided equally between them.

In other respects the decree below is affirmed. The costs of this appeal will be equally divided.

NOTE.—The following is the opinion of Tayler, District Judge, in the court below:

TAYLER, District Judge. This is a case of collision between libelant's steamer Sir Henry Bessemer and respondent's steamer Sylvania. The respondent has also filed a cross-libel against the Bessemer. The collision occurred about 1 o'clock on the morning of June 13, 1903, on Lake Superior, a short distance south of Whitefish Point. For some time before and some time after the accident the weather was thick and foggy, but at the time immediately related to the accident itself it had somewhat cleared up. While I do not doubt that there was some fog interfering with perfect vision, yet all of the witnesses agree that the lights of the vessels could be distinguished at least a mile away. Both are large vessels, the Bessemer being 413 feet on her keel, with a beam of 48 feet, and the Sylvania 504 feet on her keel, with a beam of 54 feet. The Bessemer was going north, light, and the Sylvania was coming south with a cargo of over 9,000 tons of ore. The whaleback steamer, J. B. Trevor, also belonging to the libelant, was about three-quarters of a mile north of the Bessemer, and consequently passed the Sylvania a very few moments before the collision. It thus appears that those of the Trevor's crew who were on deck had an opportunity to see the movements of the vessels up to the time of the collision.

It seems that practically everybody, on all three of the vessels, who saw the collision and had knowledge of the conditions just preceding the collision, testified. The master and crew of the Trevor, being in the employ of the libelant, may be said to be interested, or at least not wholly disinterested, witnesses, and of course that circumstance must have some weight in determining their credibility. They are more likely to testify in favor of the side which employs them than in favor of the side which does not employ them; but they are less likely, it seems to me, to be interested, and hence to be untruthful or mistaken, than those employed on board a vessel the propriety of whose movements is challenged. In the latter case there is not only the same employer, but a question of propriety of conduct on the part of the very persons who are testifying, or of their immediate associates on board the vessel. So far, therefore, as the mere matter of interest or prejudice is concerned, it seems to me that the testimony of the witnesses on the Trevor is entitled to more weight than that of the officers and crews of the Sylvania and of the Bessemer.

The testimony is irreconcilably conflicting, both as to the signals which passed between the Sylvania and the Bessemer and as to their relative locations as affecting the natural movement which each one was likely to expect the other to make. The Bessemer claims that she and the Sylvania four times exchanged one-blast signals for the vessels to pass port to port, the last exchange occurring immediately before the collision. The Sylvania, on the other hand, claims that she twice gave the signal of two blasts for the vessels to pass starboard to starboard; that the Bessemer did not answer either; that she then gave another signal of two blasts, to which the Bessemer responded with one blast, to which the Sylvania replied with one; and then in endeavoring to make what the captain said was impossible to do, but was the best he could do, the effort to pass port to port, the collision occurred. The Bessemer claims that when the Sylvania was passing the Trevor on the Trevor's port side, and some 600 feet away, she showed her red light to the Bessemer, which would mean that the course of the Bessemer was on the port side of the Sylvania.

The crew of the Bessemer claim that she was on her course in a northerly direction a little on the port side (from a quarter to half a point) of the Trevor's course, and gradually crowding in toward the Trevor's course, so that when she should reach Whitefish Point she would be about in the Trevor's wake. The crew of the Trevor who saw the Bessemer say that she was so near to the Trevor's course that she showed both her red and green lights and her range lights were about closed; that if the Sylvania had continued on her course as she was going when passing the Trevor, and the Bessemer had continued on her course as she was going at that moment, the two vessels would have passed each other a considerable distance apart port to port. The crew

of the Sylvania claim that as she passed the Trevor she picked up the Bessemer's green light, which would imply that the natural course of passage, if she and the Bessemer did not change their course, would be starboard to starboard.

It seems to me that the weight of the testimony is overwhelmingly in favor of the claim that the relative positions of the vessels prior to the movement when a dangerous situation arose were as claimed by the crew of the Bessemer and of the Trevor. The wheelman of the Sylvania, while passing, or just after having passed, the Trevor, according to his own testimony and that of his master and mate, starboarded his helm and thus gave his heavy vessel a swing to port. I am inclined to the opinion that this movement was not carefully watched in relation to the movement of the Bessemer; that her speed was not checked to less than seven or eight miles an hour; that, while not foggy, it was yet somewhat murky, and a careful watch was not kept of the situation of the lights of the Bessemer; that he swung too much to port, more than he intended, and he continued to swing too long; and that, before it was discovered that a situation of danger had come about, an effort was made by 'both vessels to avoid a collision without success. It is possible that neither the Sylvania nor the Bessemer acted with the best judgment at the moment when serious danger of collision was apparent; but I think that both parties were then in extremis, and that neither ought to be held responsible for that which occurred in the way of seamanship after the Sylvania gave the last single blast.

The master of the Sylvania testifies that when the Sylvania blew her two-blast signal the third time, and the Bessemer responded with one blast, the two vessels were from 1,200 to 1,500 feet apart, and the latter vessel was 2½ points to the starboard of the Sylvania's course; that if neither had changed her course the vessels would have passed each other starboard to starboard about 1,100 feet apart. Then it was, so this witness says, that the Bessemer changed her course and the Sylvania gave her one-blast signal. I would not pretend to say that, if these relative positions of the two boats when the Bessemer blew this one-blast signal are given by the master of the Sylvania with substantial accuracy, the results which followed could not occur. If they are, then the movements of the Bessemer must have been so erratic as to challenge the sanity of her wheelman or suggest a purpose on her part to ram the Sylvania; and it of course follows that if, at the time the Sylvania was passing the Trevor, the Bessemer was 2½ points to the starboard of the Sylvania's course, the witnesses from the Trevor are manifestly fabricating their testimony. Nor do I see how it is possible, under all the other apparent circumstances in the case, that the Bessemer could have been in the position which the Sylvania placed her in, at the time when the Sylvania was passing the Trevor, and a collision occur practically exactly astern of the Trevor.

If I were not as well satisfied as I am with the general truthfulness of the account given by the crew of the Bessemer and of the Trevor as to the signals and as to the relative positions of the boats, I would still have to resolve the questions in this case against the Sylvania, because of the failure of her master to act with due care, under the circumstances, when, if it be true, as claimed by the Sylvania's crew, the Sylvania, having twice blown for a starboard to starboard passing without any response from the Bessemer, still continued on her way; her master claiming that he did not apprehend any danger and that he had no doubt that the Bessemer understood the movement of the Sylvania. In a word, I conclude that the Sylvania proceeded on her course under such circumstances as imperatively demanded that she should wholly check her headway, or give the danger signal, or both. I cannot see how the conduct of the master of the Sylvania can be excused, in view of the fact that her signals were not responded to and that the collision occurred. The only excuse given for the failure of the Sylvania to apprehend that the situation was dangerous is that vessels often fail to respond to passing signals. That may be admitted. It proves nothing more than that carelessness does not always result disastrously.

As to what this situation was as respects the point that I have just made, the following reference to the testimony of the chief mate of the Sylvania will show us how that vessel was at fault, in view of the Bessemer's failure to

respond, and in view of the crossed signals. This witness says that he thinks they were about a mile and a half from the Bessemer when he saw her green light and then her open range lights. Quoting from his testimony, we find this: "When we saw her green light and her range light, and the way they headed, we blew her two blasts of our whistle, didn't get any answer and blew two more, waited a short time and didn't get any answer and blew two more. At that time she answered us with one." He then goes on to say that when the Bessemer, with one blast, answered the Sylvania's third signal of two blasts, she was about three-quarters of a mile away. It seems to me that the failure twice to answer the Sylvania's two-blast signal, and then the answer of one blast to her third two-blast signal, imposed a duty of care which the Sylvania conspicuously failed to regard.

Nor can we accept, apart from the considerations which I have already presented, the theory of the Sylvania's crew as to the general conduct of the Bessemer, except upon the theory that the Bessemer deliberately ran out of her course, upon discovering the location of the Sylvania, and ran into her. Certainly the conduct of the Bessemer, under the circumstances of the case as claimed by the libelant, can be otherwise reconciled with no consistent theory of human conduct.

I therefore am clearly of the opinion that the libelant has made out its case and that the cross-libel should be dismissed.