## THE GOLDEN ROD et al.

(District Court, E. D. New York. January 31, 1912.)

1. COLLISION (§ 95*)—TOWS MEETING—DISOBEDIENCE OF RULE BY TUG.

When Transfer No. 20 with a car float on either side was passing up through Hell Gate against an ebb tide, she met the tug Golden Rod, with two barges in tow on a line; the entire tow being 335 feet in length. It was in the daytime, and the vessels saw each other and exchanged signals for passing port to port when some 3,000 feet apart. The Golden Rod was outside of another tow which she was overtaking, but, instead of falling back on entering the narrow channel as required by pilot rule 7, she kept on, and attempted to cross the bow of the other tug before meeting the Transfer, with the result that her tow was swung over by the action of the tide, and came into collision with the Transfer's port car float. The collision occurred on the Long Island side of the channel. *Held*, that the Golden Rod was in fault for not obeying the rule, and that the Transfer was not in fault, having stopped as soon as it became

---

certain that the Golden Rod would not drop back, to afford her all the opportunity possible to get her tow ahead of the other before they met.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200-202; Dec. Dig. § 95.*

Collision with or between towing vessels and vessels in tow. See note to The John Englis, 100 C. C. A. 581.]

2. COLLISION (§ 1*)—RIGHT TO RELY ON OBEDIENCE TO RULES BY OTHER VESSELS.

In a situation of danger, an approaching vessel has the right to expect that other vessels will move according to the rules governing them in their relative positions, and that a vessel bound to comply with any rule will not create a new situation, in which the proximate danger guarded against by the rule may be avoided, but in which a greater danger will be created by conditions which respect for the rule would prevent.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 1; Dec. Dig. § 1.*]

In Admiralty. Suit for collision by the C. F. Harms Company, as owner of the barge Crow, against the steam tugs Golden Rod and Transfer No. 20. Decree for libelant against the Golden Rod alone.

Herbert Green, for libelant.

Alexander & Ash (Peter Alexander, of counsel), for the Golden Rod.

Charles M. Sheafe, Jr. (James T. Kilbreth, of counsel), for Transfer No. 20.

CHATFIELD, District Judge. [1] The libelant is the owner of a barge which, without fault on its part, was injured while in tow of the tug Golden Rod by collision with a float, then being towed on the port side of the tug Transfer No. 20, in Hell Gate, upon the 15th day of January, 1911. There being no fault on the part of the barge, and the Golden Rod and Transfer having both been brought in, the case develops into charges of fault by the Golden Rod against the Transfer, and counter charges by the Transfer against the Golden Rod.

A difficult question of fact arises. The tide was running ebb, at a rate of not less than four miles an hour. The accident occurred in the daytime, and in clear weather, although the sky was overcast. All of the vessels saw each other, no mistake of signals occurred, no failure to give warning by any lookout or delay in observation on the part of the boats occurred, and but two questions of fact are presented for decision. The first is the place of collision, which includes the relative positions of the boats; and, second, the movements of the boats and their exact positions from the time signals were exchanged.

Transfer No. 20 is one of the powerful tugs frequently passing up and down through Hell Gate, in the service of the New Haven Railroad. Her captain had many years of service in New York waters, and particularly upon the very trip which he was making on this day. There is no dispute that the Transfer was proceeding up the river at a fair speed around Hallett's Point, and, as she made the turn in front of what is known as Pot Cove, she observed two tows coming down toward the Gate. Both tows at the same time observed her, and the testimony of all the witnesses is to the effect that, when

more than 3,000 feet apart, the pilots or masters of the three boats could clearly observe everything that was going on. The Transfer had a large car float upon each side; these floats being 327 feet in length and about 40 feet in width. Each float was loaded with freight cars, and, as they straightened out after making the turn referred to, they followed what is apparently for some distance a straight course, against a true ebb tide, running parallel to the Long Island shore. The captain, lookout, deck hand, and engineer of the Transfer fix their position within 50 feet of the shore, but the captain of the Golden Rod has drawn upon the chart his idea of the course of the Transfer, at a distance of about 200 feet from the shore; and the captain of the Transfer himself has made a diagram (Exhibit A), in which he locates the Transfer's tow some 200 or more feet off shore. The width of the Transfer and its floats at the stern was more than 110 feet, as the tug was about 30 feet beam, while at the bow the floats were drawn together somewhat. The captain of the Transfer testifies that after having blown one whistle, which was answered by the tow nearest midstream, he saw that there would not be room for his boats to pass if this tow to which the signal was given came on past the other, and that he relied upon her falling back before coming to the narrow portion of the channel. Instead of so doing, she continued her course until a point was reached opposite Negro Point Bluff on Ward's Island, where the captain of this tow put his helm to port, and attempted to work to starboard around the bow of the tow in shore. It was then too late for the Transfer to fall back without going ashore herself. By this time both of the tows and the Transfer with its floats were subjected to the effect of the cross-tide setting from Negro Point Bluff toward the Long Island shore. The Transfer was holding her way against this tide, but, as the tow of the Golden Rod turned to starboard, the set of the tide, before the tow could be drawn out of the way, swung the rear barge (which was being towed stern first) at a point not less than three nor more than 15 feet from the starboard forward corner, against the port forward corner of the float upon the port side of the Transfer.

This tow of the Golden Rod (which is a boat 30 feet wide by 62 feet long) consisted of a barge, the Sarah, upon a hawser 75 feet long, and a barge, the Crow, which suffered the damage by collision. The Crow was close up to the Sarah, and was herself 30 feet wide and 95 feet long. The Sarah was about the same width and about 90 feet in length. Thus the entire length of this tow was approximately 325 feet. If proceeding in a straight line, its width would be no more than 30 feet, but, according to all the testimony, the tug was holding over to starboard, so as to counteract the effect of the ebb tide, and the barges were towed to port a distance estimated by the captain of the Golden Rod at 25 feet, and by the captain of the Crow at 50 feet. This tow of the Golden Rod had come around Lawrence Point between the Middle Ground and the Sunken Meadows, and then followed a steady course until she had passed Negro Point Bluff. She was making about six knots an hour, and her captain estimates the tide at five knots, giving a combined speed of eleven knots over the ground. The other tow which affected the situation consisted of two

boats in charge of the tug O'Brien Brothers, which came down the Sound over the Middle Ground ahead of the Golden Rod, and on a course which brought them, as testified to by the captain of the O'Brien Brothers and the captain of the Golden Rod, about 100 or 150 feet off Negro Point Bluff, and there immediately inside of the Golden Rod and her tow. The O'Brien Brothers' speed was about one knot less than that of the Golden Rod. Apparently at Sunken Meadows the Golden Rod crossed the wake of the O'Brien Brothers, which then slowed up to allow the Golden Rod to go by. The Golden Rod began to overhaul the O'Brien Brothers' tow, opposite Little Hell Gate, or the upper end of Ward's Island. A one-whistle signal was exchanged between the Transfer and the Golden Rod, which was bound from its position to answer the signal and to protect the O'Brien Brothers' tow, when the tows were off the upper end of Ward's Island, and when it is admitted by all the witnesses the Golden Rod had commenced to lap or pass the O'Brien Brothers' tow. From this point the two boats running with the tide traveled before the collision about half a mile, while the Transfer, running against the tide, traveled to the place indicated by her captain as the point of collision, some 2,000 feet.

The captain of the Transfer has put in evidence a diagram made by him in connection with his report immediately after the collision, in which he locates his float close to the Long Island shore, and the tow of the O'Brien Brothers and the tow of the Golden Rod as at all times to port of midchannel, indicating by this diagram that both the O'Brien Brothers' tow and the Golden Rod's tow had been carried over bodily—that is, shifted to port by the set of the tide—to such a degree that both boats were occupying a part of the river where they had no business to navigate. The captain of the O'Brien Brothers was called as a witness, and he corroborates the captain of the Golden Rod in fixing the position of both tows prior to the collision, as just off the Ward's Island shore, but he corroborates the captain of the Transfer in fixing its position as just off from the Long Island shore, and suddenly transfers the Golden Rod and the O'Brien Brothers to a point some 200 feet further to port, or substantially into the position located by the captain of the Transfer as the place of collision. The captain of the O'Brien Brothers, the captain of the Transfer, and to some extent the captain of the Golden Rod, all agree that the tow of the Golden Rod had not completely cleared or passed the tug O'Brien Brothers. The captain of the Transfer, corroborated to some extent by the captain of the O'Brien Brothers, places the Golden Rod barely ahead of the O'Brien Brothers' tug, but with the tows still alongside of each other. The captain of the barge which was struck did not see the O'Brien Brothers' tug at any time. Other witnesses upon the Golden Rod locate the O'Brien Brothers as almost directly astern, but this would put the O'Brien Brothers hundreds of feet from her actual position, as the Golden Rod was at this time working to starboard according to all the testimony. If this had been the position of the boats, the O'Brien Brothers would have gotten in trouble also.

It is some 3,000 feet from Little Hell Gate to the point of collision. While passing they were moving at a rate of 1,100 and 1,000 feet per minute, respectively. Hence they covered the distance in

less than three minutes, and the Golden Rod would have gained 300 feet. Her tow was 335 feet long, and the O'Brien Brothers' tow was about the same length. It is evident that a gain of 670 feet at least was necessary to let the Golden Rod get into a course ahead of the O'Brien Brothers. These figures exactly corroborate the witnesses, who place the Golden Rod as just passing the O'Brien Brothers' tug.

The captain of the Golden Rod charges the captain of the Transfer with a rank sheer to port, and a forward movement of some 200 or 300 feet under the effect of this sheer, explaining that it occurred because of the Transfer's reaching the point where the tide set over to the Long Island shore. The captain of the Transfer charges the captain of the Golden Rod with a swing to starboard, in an attempt to pull around ahead of the O'Brien Brothers' tow and out of the way of the Transfer. This maneuver was not of itself negligent or blamable at the time, for, if it had not occurred, the captain of the Transfer says that the Golden Rod's tow would probably have gone into the car float's broadside. This broadside collision might have been less injurious than what occurred, but the execution of such a maneuver just at the time of the collision could not be held negligent.

The Transfer has not alleged fault against the O'Brien Brothers, because the whistle signal was properly given to the Golden Rod, and she accepted responsibility for the situation, and never by alarm or otherwise attempted to do more than rely upon her own efforts. If the O'Brien Brothers was in the position located by the captain of the Transfer, she would still be substantially in the middle of the channel, and would have interfered only with the Golden Rod's movements. If she occupied the position located by her captain and that of the captain of the Golden Rod, the O'Brien Brothers had nothing at all to do with the difficulties of the colliding boats.

The Transfer has alleged fault against the Golden Rod for not obeying rule 7, requiring an overtaking tow coming down through Hell Gate at ebb tide to fall back and let a tow ahead of her and to starboard pass through the Gate first. This rule was in effect when the collision occurred, but has since been changed. It was plainly a rule to provide protection for the overtaken vessel. At the same time it established a binding rule upon the overtaking vessel, so as to insure safety by observing single file and actually falling back if the boats be so located as to reach the narrow passage side by side. An evasion of the rule, if collision results with a vessel coming in the opposite direction, cannot be excused by suggesting that an approaching vessel would understand that the overtaking tow was not intending to obey the rule, but was putting the approaching vessel into danger because this could be done without risk to the tow which was being overtaken, and for whose benefit the rule was primarily intended.

[2] In a situation of danger, an approaching vessel has the right to expect that other vessels will move according to the rules governing them in their relative positions, and to expect that a vessel bound to comply with any rule will not create a new situation, in which the proximate danger guarded against by the rule may be avoided, but in which a greater danger will be created by conditions which respect for the rule would prevent.

When the one-whistle signal was given, the Golden Rod and her tow were going faster than the tide, and could easily have held back of the tow of the O'Brien Brothers, as they had the whole width of the river on the side toward which they would drift with the tide. An attempt to pass the O'Brien Brothers would have been allowable only if the O'Brien Brothers accepted a signal or direction to so yield her rights and give the Golden Rod room as to allow the Golden Rod to obtain the lead before the approaching vessel was reached. If the O'Brien Brothers was unable because of the tide, or unwilling to take any other course or speed than that which she did take and which she had a right to take, then the captain of the Golden Rod must be held to have known the danger which was likely to result, for he was familiar with these waters and familiar with the rule in question, and he cannot excuse his presence either alongside or substantially past the O'Brien Brothers' tow, unless the court find as a fact that both tows were over to the starboard side of the channel, and that the Transfer deliberately crossed the river to such an extent as to bring the boats into collision, under a miscalculation of the space which the Golden Rod's tow would occupy as it swung with the tide. If the Golden Rod were over toward the Long Island side of the channel, such miscalculation may have entered into the situation. But, if we put the Golden Rod where her captain says she was, then the Transfer must have crossed the river to port for several hundred feet, in order to be where a miscalculation could have caused the accident.

The court is satisfied that no such movement on the part of the Transfer has been proven. Plenty of water and a clear river was in front of the Transfer to the east. The testimony of witnesses for the Transfer is persuasive that, before the collision, she stopped her engines and waited, her captain testifying that in his opinion there was not room for the vessels to pass at the point in the channel where they were going to meet, and that he therefore stopped his engines and substantially stood still; the way of the Transfer being merely sufficient to overcome the effect of the tide. Under these circumstances, even if the O'Brien Brothers had forced the Golden Rod to a position where she could not avoid the Transfer, it must be held that the responsibility for getting in that position was with the Golden Rod; that an observance of rule 7 would have protected the O'Brien Brothers so far as the Golden Rod was concerned, but would also have kept the Golden Rod in a position where a reliance by the O'Brien Brothers upon her rights would not have given rise to the danger of collision between the barge and the Transfer. The collision according to the testimony must have occurred more to the port side of the channel and nearer the Long Island shore than the captain of the Golden Rod locates it.

The only remaining question to consider is the responsibility of the Transfer in proceeding up the river and into the narrowest part of the channel after she had given a one-whistle signal to an approaching tow, which she saw at the time of the signal was to port of another tow, which it was then passing. The fact that the Golden Rod was given the signal and answered the signal, and that the Transfer saw no reason to signal the O'Brien Brothers, is positive proof that the

Golden Rod was then passing the O'Brien Brothers, and was not in a position where she was expected to come down inshore of the O'Brien Brothers.

The captain of the Transfer testifies that he expected the Golden Rod's tow to drop back, and that, when he did stop his engines, he did so because he saw that she had not dropped back. Before this, he proceeded against the tide some 2,000 feet, and ultimately stopped at a point where he could not back and could not do anything to avoid being struck as the Golden Rod attempted to pull out of the way. Inasmuch as both the O'Brien Brothers and the Golden Rod were affected by the same ebb tide, it would appear that the Golden Rod could have dropped back at any time before the boats actually rounded Negro Point Bluff, and it is apparent that the Transfer by that time had reached a position from which she could not do more than she did do to avoid collision. If the O'Brien Brothers by slowing up had waived rule 7 and let the Golden Rod start to go through ahead, then the Transfer should not be blamed if the O'Brien Brothers kept too close to the Golden Rod until it was too late for the Transfer to tell which of the others would yield. Even a mistake in estimating the swing of the rear scow in the Golden Rod's tow, and a failure on the part of the Transfer to stop quick enough to avoid being carried to a point where the extreme corner of her nearest float failed to clear by from 3 to 15 feet, would not seem to be such negligence on the part of the captain of the Transfer as to justify holding her responsible for a part of the damages of the collision, in the face of the apparently plain fault on the part of the Golden Rod. Perhaps a little more caution on the part of the captain of the Transfer and greater readiness to anticipate that the Golden Rod was not intending to respect rule 7, but was negligently disregarding that rule upon the theory that the O'Brien Brothers would either give way, or that the Golden Rod could pass so quickly as to make observance of the rule unnecessary, would have allowed him to avoid the collision. But this cannot be considered negligence on his part, nor should he be thereby made responsible for an accident of which the proximate cause was plainly the miscalculation on the part of the Golden Rod, or utter disregard by her of the rights of the other parties.

The cases in which damages have been divided because one of the vessels has been approaching a situation recognized as dangerous and has failed to observe ordinary precautions, but has insisted upon the right of way or has relied on compliance with the rules by other vessels after they have passed the point where compliance could be observed, such as Duluth Steamship Co. v. Pittsburg Steamship Co., 180 Fed. 656, 103 C. C. A. 622, U. S. v. Erie R. Co., 172 Fed. 50, 96 C. C. A. 538, and The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126, cannot apply in this case. To hold the Transfer at fault for proceeding a few feet too far toward the east before she stopped her engines and waited seems to be impossible. The necessity for careful estimate on the part of the Golden Rod before attempting to pass the O'Brien Brothers, or on the part of both the Golden Rod and the O'Brien Brothers, if the latter tug was slowing up and the Golden Rod was endeavoring to go ahead, makes it necessary to hold (even

if the Transfer could see that rule 7 had been disregarded and that the Golden Rod was seeking to take the lead) that the Transfer should not be punished for not being able to estimate better than the Golden Rod what the Golden Rod was capable of accomplishing in the dangerous situation which she chose for herself, or for not being able to tell what the O'Brien Brothers would do.

It must be remembered that the O'Brien Brothers could always have given way, and, if the Transfer could be blamed, after the O'Brien Brothers had waived the requirements of rule 7, the O'Brien Brothers could be held in fault as well, and the court would have to try the issue between her and the Transfer.

The libelant may have a decree against the Golden Rod for his damages and costs, and the libel against the Transfer must be dismissed.